IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
* * * * * * * * * * *     * CRIMINAL ACTION
USA                       * 07-100
                          *
VS.                       * APRIL 9, 2008
                          *
ADOLFO VERDUGO and        *
RAFAEL FERNANDEZ-ROQUE    *
                          * PROVIDENCE, RI
* * * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(TESTIMONY OF GARLAND RYAN ARNOLD)

APPEARANCES:

| | |
|---|---|
| FOR THE GOVERNMENT: | MARY ROGERS, ATTY.<br>U.S. Attorney's Office<br>50 Kennedy Plaza<br>Providence, RI 02903 |
| FOR THE DEFENDANT ADOLFO VERDUGO: | JOSEPH J. VOCCOLA, ESQ.<br>454 Broadway<br>Providence, RI 02903 |
| | JOHN F. LUSI, ESQ.<br>29 Okie Street<br>Providence, RI 02908 |
| FOR THE DEFENDANT RAFAEL FERNANDEZ-ROQUE: | ANDREW H. BERG, ESQ.<br>Sammartino & Berg<br>128 Dorrance Street<br>Suite 400<br>Providence, RI 02903 |
| Court Reporter: | Anne M. Clayton, RPR<br>One Exchange Terrace<br>Providence, RI 02903 |

Proceeding reported and produced by computer-aided stenography

I N D E X

| WITNESS | PAGE |
|---|---|
| GARLAND RYAN ARNOLD | |
| Direct Examination by Ms. Rogers: | 3 |
| Cross-Examination by Mr. Berg: | 29 |
| Cross-Examination by Mr. Verdugo: | 41 |
| Redirect Examination by Ms. Rogers: | 49 |

______________________________

GARLAND RYAN ARNOLD, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: Garland Ryan Arnold, A-R-N-O-L-D.

THE COURT: Good afternoon, Mr. Arnold.

THE WITNESS: Good afternoon, your Honor.

THE COURT: You may inquire, Ms. Rogers.

DIRECT EXAMINATION BY MS. ROGERS

Q. What is your occupation?

A. I'm a special agent with the United States Department of Homeland Security, Immigrations and Customs Enforcement.

Q. How long have you been with -- can we call it ICE?

A. Yes.

Q. How long have you been with ICE?

A. I've been with ICE since it's inception in 2003. Prior to that, I was a special agent with the Immigration and Naturalization Service since 2002.

Q. Prior to that, where were you employed?

A. United States border patrol agent in Zapata, Texas. That's Z-A-P-A-T-A, Laredo sector, South Texas.

Q. For how long?

A. From 1998 until 2002.

Q. Had you ever encountered cocaine during your

career as a border patrol agent or an ICE agent?
A. Yes. Several times, both positions.
Q. Do you speak any languages other than English?
A. Yes. I have a working knowledge of Spanish.
Q. What is your background in the Spanish language?
A. United States border patrol you tend to -- in the academy that lasts approximately 20 weeks, during the course of that academy, they have an intensive Spanish training program. At the conclusion of the academy, they have post-academy training, and they have the oral boards at the six-month and ten-month mark where they test your proficiency in the Spanish language and ensure that you can ask simple biographical questions as well as Mirandize somebody, and also to ask simple questions in regards to various smuggling-related cases.
Q. Directing your attention to -- did you pass those exams?
A. Yes, I did.
Q. Directing your attention to May 30th, 2007, were you asked by DEA to assist in an investigation?
A. Yes, I was.
Q. In what area were you directed to?
A. I was directed to go out to the Springfield area and assist them in an arrest they felt was going to

happen in the next couple of hours.

Q. And did you become involved in an investigation of individuals later identified as Rafael Fernandez-Roque and Adolfo Verdugo?

A. Yes.

Q. How is it that you came to be involved?

A. I was there on Route 90 right prior to when Roque and his partner was stopped on the vehicle stop. I assisted Agent John Barron and the other agents that were out there on that roadside stop.

Q. Were you in your own vehicle?

A. Yes.

Q. And where did you park?

A. I parked several vehicles behind the state trooper that pulled over Rafael Fernandez-Roque and Burgos, Rudy Burgos.

Q. Do you recall approximately what time this was?

A. Sometime between 3:00 a.m. and 6:00 a.m.

Q. And what did you see?

A. I exited my vehicle. There were several agents going up to the vehicle that was pulled over. I saw two defendants in the vehicle. They were kind of staring forward, like a deer in a headlights almost.

MR. BERG: Object to the characterization, Judge.

THE COURT: All right. I'm going to overrule it. I think it's fair. So overruled.

A. The state police was trying to get the driver to open up his door. The driver and the passenger eventually got their doors open, and the two subjects were taken into custody.

Q. Did you see anything with regard to the Jeep Cherokee?

A. There was a large black bag in the rear seat of the Jeep Cherokee so you could see it upon walking up.

Q. Did you recognize anything when you saw that large duffle bag?

A. I didn't recognize anything in the duffle bag specifically. When the door was open, I could smell the odor of cocaine coming out of the vehicle.

Q. Where was it located?

A. The black bag?

Q. Yes.

A. It was in the rear -- the seat behind the passenger and driver seat, sort of the middle or back seat of this SUV.

Q. Are you familiar with the smell of cocaine?

A. Yes.

Q. What happened next?

A. I was instructed to go to the Charlton,

Massachusetts state police barracks and assist --
Q. Before that, did you see the bag secured?
A. Yes. Special Agent John Barron of the Drug Enforcement Administration, I saw him remove the bag and secure it.
Q. And then where did you go?
A. Then I went to the Charlton police barracks in Massachusetts to assist in interviewing the subjects.
Q. What was your purpose in being there?
A. I was there to conduct immigration interviews, to see if there was any immigration-related charges that we could file on the subjects.
Q. And who did you meet with there?
A. Agent-wise or suspect-wise?
Q. Suspect-wise.
A. I met with Juan Carlos Delgadillo, who's come under a whole series of aliases. He was in one cell. And then there was Rafael Fernandez and the other subject, which was -- I'm drawing a blank now. There was three subjects.
Q. Does the name Betancourt-Rodriguez --
A. Betancourt-Rodriguez. That's it.
Q. Did you speak with each of these individuals?
A. I did.
Q. Who did you speak with first?

A. I believe I spoke to Juan Carlos first.
Q. Prior to speaking with the men, what did you do?
A. I presented my credentials showing that I was an immigration agent, informed them verbally that I was an immigration agent and advised them of their rights pursuant to Miranda versus Arizona.
Q. In what language did you do this?
A. Spanish language.
Q. How did you Mirandize them?
A. I had a card in my credentials. I removed the card and read the Miranda rights verbatim from the card.
Q. After speaking with Juan Carlos, did you speak with Mr. Betancourt-Rodriguez and Mr. Fernandez-Roque individually or together?
A. They were together.
Q. And did you also Mirandize them?
A. Yes, I did.
Q. Did they indicate that they understood the Miranda warnings?
A. Yes, they did.
Q. This was done in Spanish?
A. Yes.
Q. Did they agree to waive their Miranda rights?
A. Yes, they did.

Q. A total of how many individuals did you Mirandize at the Charlton barracks that night?
A. Three people total.
Q. Was anyone else present when you were speaking with Mr. Fernandez-Roque?
A. Yes. Agent Mike Naylor of the Providence office, and there was other agents in and out of the room.
Q. And directing your attention to Mr. Fernandez-Roque, after he agreed or he indicated he understood his Miranda warnings and agreed to speak, what questions, if any, did you ask him?
A. I asked him his name, his date of birth, his parents' name, his place of birth, when he entered the country, and where he worked.
Q. And what did he reply with regard to his name?
A. Rafael Fernandez-Roque -- sorry. Rafael Fernandez -- I'm drawing a blank. I'm sorry.
Q. Roque?
A. Roque.
Q. And did he give you his date of birth and his parents' names?
A. He did. I don't recall, but I placed them in my notes.
Q. And he indicated his place of birth?
A. It was, I believe, Puerto Vallerta, Mexico.

Q. Did you ask him where he lived?
A. I did. He stated that he lived in Providence, Rhode Island but he could not remember where and that he had only been here for about a month.
Q. He had only been in Rhode Island for about a month?
A. Yes.
Q. Did you ask him where he worked?
A. I did. He stated he worked at Juan Carlos's garage.
Q. Prior to this date, May 30th of 2007, had you been involved in a related investigation out of Massachusetts?
A. Yes, I was.
Q. And as part of that investigation, had you done any surveillances of any garages?
A. Yes.
Q. And where was that garage?
MR. BERG: Object to this line of questioning, Judge.
MS. ROGERS: I'll withdraw that question.
THE COURT: Very well.
Q. Did Agent Naylor ask any questions of the defendant through you as the interpreter, Mr. Roque, after you had Mirandized Mr. Roque in Spanish and he'd

waived those rights?

A. Yes, he did.

Q. And what question was that?

A. There was a silver cellular phone Agent Naylor raised up and said, "Whose is this?" I don't know if I translated that verbatim or Roque just raised his hand, but he did raise his hand and indicated that was his cellphone.

Q. After you finished at the Charlton barracks, where did you go?

A. I drove to the Northampton barracks and interviewed two other subjects.

Q. Is that located up on 91 North?

A. Yes.

Q. What did you do there?

A. I arrived at the barracks. I checked in with a -- I believe his name is Tom Nartowicz. He's a state police detective. He informed me that the two people that were related in this investigation were in a muster area. I went into that muster area. I identified myself to the two individuals as an immigration agent. Presented my credentials. Advised them of their rights pursuant to Miranda v. Arizona and questioned them relating to their citizenship and nationality.

Q. Did you speak with both men?
A. Yes.
Q. And did you later learn the identity of both men?
A. Yes.
Q. And do you recall their names?
A. One's name was Cortez; the other name was Verdugo, last names.
Q. Did you Mirandize Mr. Verdugo?
A. Yes.
Q. And in what language?
A. Spanish language.
Q. And did he appear to understand them?
A. Yes, he did.
Q. Did he agree to waive them?
A. Yes, he did.
Q. Did he say anything to you about the Miranda warnings?
A. He stated that he had just been Mirandized prior to me showing up.
Q. In what language did the two of you speak after you Mirandized him?
A. Pretty much in English. It was a combination of English and Spanish. But for the most part, it was in English.
Q. And approximately how long did you speak with

Mr. Verdugo and Mr. Arias-Cortez on May 30th, 2007?
A. Approximately 30 minutes. Could have been as long as 40, could have been as less as 20. Around 30 minutes.
Q. Have you had an opportunity to listen to any of the wiretap conversations in this case?
A. Yes, I have.
MR. VOCCOLA: Objection, your Honor.
THE COURT: Grounds.
MR. VOCCOLA: Rule 16.
THE COURT: Would you come up.
(Side-bar conference.)
THE COURT: First of all, where are you going with this line?
MS. ROGERS: On cross-examination of Agent Naylor, Mr. Voccola raised the question whether anyone else had listened to the voice of Mr. Verdugo. He went into it at great length.
THE COURT: Right. Okay. So what's the objection?
MR. VOCCOLA: He never mentioned Agent Arnold. It was never provided in discovery that Arnold would come in as an expert to attest to voice identification. The Government clearly knows what Naylor has said, and I'm expecting, I think we learned this through the

benefit of Mr. Berg's cross-examination yesterday that Arnold within the last few days started listening to tapes and is prepared to give expert testimony as to voice identification, if I'm on the correct path, your Honor.

MS. ROGERS: It's not expert testimony. A lay person can identify voices. And I think Mr. Voccola is confusing the Rule 16 in state court with Federal Court. I do not have to disclose everything, and he raised this or Mr. Berg raised it. Mr. Voccola definitely raised this on cross-examination, and it's an issue now.

MR. BERG: Is there any testimony similar regarding my client?

MS. ROGERS: Yes.

MR. BERG: I'd like to say, Judge, that, in that respect, Agent Arnold spoke to my client for about 20 minutes almost a year ago and now he's going to come in here and he just listened within the last two days --

MS. ROGERS: Yes.

MR. BERG: He's going to come in here and say he remembers a voice he spoke to 20 minutes ago as being one he has heard on a recording, I would suggest he is so unreliable as an opinion as to have no probative value. I know it's a weight issue, Judge, and subject

to cross, but I would say that's not even worthy of coming into evidence.

THE COURT: What is the -- give me an offer of proof as to what you expect him to say.

MS. ROGERS: That Mr. Arnold listened to the voice of --

THE COURT: When?

MS. ROGERS: Last night or yesterday afternoon, after it was raised on cross-examination. It was a legitimate point that was raised. There's nothing improper and the Government is investigating this. He listened to it and he said he can identify Mr. Verdugo's voice.

THE COURT: From listening to it last night, you're saying he can identify it based on the conversations he had from a year ago?

MS. ROGERS: Yes. Or a little less than a year ago, yes.

THE COURT: Well, if there's no obligation to disclose this under Rule 16, and I've got to take a look at the Rule, then it's really a matter of -- you know, I think she's correct. I think it's lay opinion testimony. It's not qualifying him as a voice recognition expert. It's not that. So then it's really subject to your cross-examination.

MR. VOCCOLA: Your Honor, with all due respect, it's surprise. Naylor unequivocally stated no other individuals than himself made any attempts to recognize Verdugo's voice.

THE COURT: That was at that point in time. As she just said, he listened to it last night.

MR. BERG: Judge, I have another ground to keep this out. I would suggest that any probative value is far outweighed by prejudicial value here. Maybe there is some probative value, but there is such a remote, such a large span of time between when he heard the real voice and he heard this that the prejudicial value is astounding. I would suggest it outweighs it to the point under Rule 403 --

MS. ROGERS: Your Honor --

THE COURT: Wait. You have to go one at a time.

MS. ROGERS: Your Honor, if it's a matter of prejudicial value, all evidence that the Government introduces is prejudicial. It's is it unfairly prejudicial or unduly prejudicial. In this case, it's absolutely not. It's to address an issue raised by the defendants themselves.

MR. VOCCOLA: Your Honor --

THE COURT: Well, strictly speaking, the issue he was cross-examined on was the identification of the

voice at the time the arrest was made. That's what Mr. Voccola and Mr. Berg were examining on.

MS. ROGERS: No. They both asked, and Mr. Voccola went into great depth about this, has anyone compared this voice to Arias-Cortez, and how do we know it's not Arias-Cortez's voice using Mr. Verdugo's phone.

THE COURT: So you expect to get that opinion out of him, too?

MS. ROGERS: Not out of this witness, no.

THE COURT: Okay.

MS. ROGERS: But it's an important element that needs to be addressed.

MR. VOCCOLA: Your Honor, if I may respond, it's a complete surprise. Secondly, if they were going to offer this testimony in their case-in-chief, they should have provided it under the Rules. I believe that's certain. If they so had, I could have had ample opportunity to bring in a string of experts myself who are fluent in Spanish and fluent in English and had them conduct interviews of Verdugo and possibly track down Esteban Arias-Cortez in California. It's highly prejudicial, your Honor.

THE COURT: We're taking a lot of time on this side bar, which I don't like doing. Do you have more

you can do with him?

MS. ROGERS: No.

THE COURT: This is it?

MS. ROGERS: He's a very short witness.

THE COURT: Who else do you have?

MS. ROGERS: After Mr. Arnold, I believe I have Tom Nartowicz, the Massachusetts state trooper. It's a different area of the case.

THE COURT: Right. I want to look at this before I allow him to testify on it. How much time will Nartowicz take?

MS. ROGERS: I imagine about the same amount of time as Agent Arnold just took.

THE COURT: Okay. I'm going to send the jury out for a break. Unfortunately, the snacks aren't here, but I want to talk about this on the record but from the bench and not keep them sitting here.

(End of side-bar conference.)

THE COURT: Ladies and gentlemen, what I'm going to do, I need to discuss something with the attorneys, and rather than continue a lengthy side bar, I'm going to send you out, give you a break. There probably are not any snacks in there, but at least it will be a little more comfortable for you, and you won't have to just be sitting here in silence. I need 10 or 15

minutes to address an issue.

I guess they are here. Charlie must have known that was coming.

(Proceedings out of the presence of the jury as follows:)

THE COURT: Agent Arnold, I'm going to have you step out of the room.

So let's continue the discussion that we were having at the side bar about this proposed testimony. Why don't you all just speak from where you are.

So the opinion testimony is based on conversation that he had a year ago with the defendant and his listening to recordings last night.

So I guess, defense counsel, why, explain to me again, it's lay opinion testimony. It seems to me you're free to put on this type of testimony as well. It's not expert testimony.

MR. VOCCOLA: Your Honor, if I may, first and foremost, we're learning about this testimony at around 2:40 on April 9th, three days into the trial. This Court has steadfast rules that it abides by. One of them is the pretrial memo.

The pretrial memo is supposed to lay out for the Court's benefit, as well as opposing counsel, expected witness testimony. Never mentioned, never proposed,

never discussed in any fashion.

I think I can be frank when I represent to the Court that the Government now realizes that there are certain problems, perhaps, with relying simply on Agent Naylor's identification and skills to perform such an identification. So at this juncture, at 2:40 in the afternoon on April 9, the Government now purports to put forth an agent, an immigration agent who apparently conducted this so-called voice comparison or analysis yesterday at some time.

Once again, no reports have been furnished conducting this analysis. We don't know the time it was done. We have no idea. If we had been notified within the proper time frame, not unduly surprised at this juncture in midstream during the trial, we could have prepared our own experts to counter that testimony.

And I would have prepared my own experts, your Honor, to counter that testimony. I am not going to be able to do that at this point. And I think that's extremely unfair.

MR. BERG: Judge, no doubt about it, this is very relevant evidence and the Government, of course, is saying it's relevant and all relevant evidence is prejudicial to some extent. But Rule 403 contemplates

a situation where relevant evidence that would ordinarily come in, its probative value is outweighed by the potential for undue prejudice. And I would suggest to the Court that this is one of those instances where the relevance is outweighed by the potential for undue prejudice.

As you noted, Agent Arnold hasn't spoken to our clients since May 30th. He comes into Court today and he's having trouble remembering the names of the people he spoke to, yet he wants to testify that based on his conversations, a 20-minute conversation in my client's case, he can link them, the voice to the recordings.

I would suggest, Judge, that that is so implausible and certainly we can cross-examine him, but the testimony is on the record and the jury is going to hear it. This type of testimony is so implausible as to create a potential for undue prejudice in the face of whatever relevance it might have. For that reason, I would suggest --

THE COURT: Why is it so implausible? I mean, it seems to me it's plausible that you could recognize the voice of someone that you talked to a year ago if you heard it again, if it was an important conversation and it's one that you paid a lot of attention to and then you heard the voice again. It's not completely

implausible to me that you could actually recognize that voice.

MR. BERG: It's not impossible, but it's fairly implausible. The guy couldn't even remember the names of the defendants.

THE COURT: But I think that's a very different kind of thing. I mean, recognition of a voice is not the same as recall of a name.

MR. BERG: Another thing is he's going to testify he heard these tapes. Were these blind recordings played for him? Did they play recordings and say who is this, or did they say here's a recording of Fernandez-Roque?

THE COURT: That sounds like cross-examination.

MR. BERG: Right. But I would suggest that if that's the case, that they said here's Fernandez-Roque in this recording --

THE COURT: Are you suggesting it should be done like a line-up or something? They should play five different voices and say which one is Fernandez-Roque?

MR. BERG: Perhaps we should have a voir dire, Judge.

THE COURT: Actually, that's where I'm thinking of going.

MR. BERG: Not even so much playing the voices

for him, except I wouldn't rule that out. He certainly knows the context of the conversations, but how was this presented yesterday. Maybe the Government can answer that question right now. Did they give him a blind listen to these tapes?

THE COURT: Let me hear from the Government. Because the Rule says that it has to be rationally based on the perception of the witness. Doesn't frame a time of that perception. So in this case, it's really two different times at which he had a perception, I guess, a year ago and last night. And helpful to a clear understanding of the witness's testimony or determination of a fact in issue. Well, it's clearly a fact in issue. So Ms. Rogers?

MS. ROGERS: Your Honor, right now, listening to all the questions that can be raised on cross-examination, I'm rethinking the advisability of introducing the testimony. But what I want clear is that the Government does not believe, in any sense of the word, that Mr. Voccola understands the difference in Rules of Discovery in state and Federal Court.

THE COURT: I think he's dropped that argument.

MS. ROGERS: Okay. Your Honor, at this point, I'll withdraw this particular line of questioning with this witness. However, there is another witness who

will testify regarding ruling out a voice. And I don't want the Court or the defense attorneys to think in any way I'm conceding their objections are correct, but it's a tactical decision.

THE COURT: Give me an offer of proof on that. What is the testimony that you expect?

MS. ROGERS: That Trooper Nartowicz stated Mr. Esteban Arias-Cortez's voice was very distinctive. And although he cannot recognize or definitively say Mr. Verdugo's voice is on a particular tape, he is positive it is not Mr. Arias-Cortez.

THE COURT: And when did he listen to the tapes?

MS. ROGERS: Yesterday.

THE COURT: So it's the same issue?

MS. ROGERS: Right. Well, no, it's not the same issue. Well, I guess, yes, it is.

THE COURT: He talked to Arias-Cortez last year, right?

MS. ROGERS: Yes.

THE COURT: And he listened to the tapes last night?

MS. ROGERS: Yes.

THE COURT: So he's going to express an opinion that having listened to the tapes, I can tell you it's not Arias-Cortez?

MS. ROGERS: Yes.

THE COURT: So we've got, essentially, the same issue. What I think we have to do is have a voir dire of Nartowicz on that point before I can rule that that's admissible. They're going to make -- all the same objections they just made as to Arnold, they will make as to Nartowicz. We can assume that. So before I can rule that it is admissible under 701 and also not excludable under 403, which I think is basically what they're arguing, I think I need to hear from Nartowicz before he testifies in front of the jury.

MS. ROGERS: I'm confused as to what the basis is for the voir dire or the need for the voir dire.

THE COURT: Well, the question is -- it has to be rationally based on perceptions of the witness. So right now I don't know what the basis of his testimony that Arias-Cortez's voice is, quote, unquote, distinctive. Why is it so distinctive that he can exclude that from the tapes?

MS. ROGERS: But I'm having trouble understanding how this is any different than Agent Naylor's testimony. It's lay opinion. We each recognize voices. And that's the sort of --

THE COURT: Because Agent Naylor both spoke to defendant Verdugo and listened to the tapes in a

contemporaneous time frame.

MS. ROGERS: But that would appear to go to the weight, not the admissibility. They're entitled to cross-examine him on the months that have gone by.

THE COURT: It might. But he testified that he spent a good two hours talking to Verdugo. As of the moment, I don't know how much Nartowicz spoke to Arias-Cortez.

MS. ROGERS: But he also testified that he only spoke or heard Mr. Roque's voice for a much smaller amount of time and did the identification.

THE COURT: Well, that's true. That's true. I just think it's more appropriately done outside the hearing of the jury before we go down that path. So I think what we should do is bring Arnold back on. You're not going to do that with him, right?

MS. ROGERS: Yes.

THE COURT: And then finish up Arnold, get started with Nartowicz, and leave that to the last bit of your direct and then we'll let the jury go, and you can do a bit of voir dire of him on this point, and they can cross him on that point.

MS. ROGERS: The Court wouldn't prefer to do the voir dire of Mr. Nartowicz right now while the jury is out?

THE COURT: No. Because I think it's going to take more time, and I think we can better utilize the jury's time if we just get through with Arnold.

MR. BERG: I have an issue, Judge, which also I want to bring up at this point, it's probably a good time.

First of all, I don't think it's on the record that you denied my motion to suppress. I just want to lodge an objection to the testimony of Agent Arnold that pertained to his interview in the cellblock with Mr. Fernandez-Roque. I don't think that's actually on the record at this point. I just want to make sure it's clear in the record.

THE COURT: I know I e-mailed you that I denied it, but I'm not sure I ever put it into the record.

MR. BERG: That's why I just raised it now, just to preserve the issue, Judge.

The second thing is I would move -- before we came into Court, I spoke to Ms. Rogers, and she represented to me that she was not going to get into the testimony of this garage in Freetown. I believe it's very prejudicial to my client that there be any information that this garage, which apparently it's alleged my client said he worked out, is related to drugs. I think there's some hearsay, certainly from

Agent Arnold.

THE COURT: She withdrew the question about the garage.

MR. BERG: She did. But the question was asked of Agent Arnold in such a manner that the bell has rung in the jury's head and I don't think it can be unrung, and I would ask for a mistrial on that basis.

THE COURT: That's denied.

MR. BERG: Thank you, Judge.

MS. ROGERS: I'd like to place on the record Mr. Berg asked me that question, and I told him I was going to ask about the garage but not the details.

THE COURT: You withdrew with question. Are you going back to that?

MS. ROGERS: No, I'm not. But I told Mr. Berg, he knew I was going to ask about --

THE COURT: That's fine. You put that on the record. I've denied the motion for the mistrial.

Let's get the jury back in.

(Proceedings in the presence of the jury as follows:)

THE COURT: Have a seat, Agent Arnold.

MS. ROGERS: Your Honor, I have no further questions at this time.

THE COURT: Thank you, Ms. Rogers.

All right. Mr. Berg?

CROSS-EXAMINATION BY MR. BERG

Q. Good afternoon, Agent Arnold.
A. Good afternoon, counsel.
Q. You testified that you've taken courses as part of your job training to understand certain elements of Spanish; is that correct?
A. Yes, sir.
Q. Particularly things that are related to your job?
A. Yes, sir.
Q. And I believe you said you have a working knowledge of Spanish; is that correct?
A. That's correct, sir.
Q. Is it also fair to say that you're not quite fluent in Spanish?
A. I don't think that's fair to say.
Q. You consider yourself fluent?
A. Depends what you mean by "fluent." I'm not a native speaker by any stretch of the imagination.
Q. It's not your first language?
A. No, sir.
Q. When you need to read the Miranda rights, instead of reading an English version of Miranda and then translating into Spanish, you actually read the Spanish version; is that correct?

A. On both sides of the card.
Q. When you read Miranda warnings to a Spanish-speaking person, you look at the English version and translate it into Spanish, or do you read from the Spanish side of your card?
A. The Spanish side, sir.
Q. And you testified you were present during the vehicle stop of the Jeep; is that correct?
A. Yes, sir.
Q. And you were actually behind the marked trooper?
A. I was several cars behind the marked trooper.
Q. You were several cars behind. How many do you think there were in front of you?
A. Several.
Q. Three?
A. More.
Q. Were you at the back of the pack?
A. Pretty much.
Q. And you testified that you could see that the defendants were like deer in the headlights; is that correct?
A. By the time I got there, yes, sir.
Q. They were still in the vehicle when you got there?
A. Yes, sir.
Q. They didn't offer any resistance; is that correct?

A. No. They just kind of froze there.
Q. And after the stop of the vehicle, you proceeded to the barracks to interview these people; is that correct?
A. Yes, sir.
Q. In fact, you had been involved in this investigation prior to May 30th, isn't that correct, also?
A. On a portion of it, yes.
Q. And I believe, is it fair to say that one of your jobs was you would be provided the names of suspects by the agents involved in this investigation, and you would check to see if they were known to immigration authorities?
A. That's correct.
Q. And it's also fair to say that before May 30th of 2007, you had never been provided the name Rafael Fernandez-Roque to check; isn't that correct?
A. That's correct, counsel.
Q. And you spoke with Mr. Fernandez-Roque that evening; is that right?
A. Morning. Early morning.
Q. The morning of May 30th; is that right?
A. Yes, sir.
Q. And you conversed in Spanish?

A. Yes, sir.
Q. And at no time did Mr. Fernandez-Roque speak in English; is that correct?
A. He might have said, "That's mine" with the phone, but I don't recall if it was English or Spanish.
Q. You don't recall him speaking English?
A. Not directly. He might have said a word or two, but nothing I can think of off the top of my head.
Q. In fact, when you asked him about the phone, I think your testimony is he raised his hand?
A. He raised his hand or he raised his hand and said, "That's mine." He definitely raised his hand.
Q. You gave testimony about this before; is that correct?
A. Yes, sir.
Q. And in your prior testimony, you indicated that it was Chacho that had the phone, isn't that correct?
A. I don't think so.
Q. Let me ask you this. You mentioned before, I believe, that you took notes as you were interviewing these subjects?
A. Yes.
Q. And as they were giving you information, you were writing these notes down; is that correct?
A. Yes, sir.

Q. And you were asking the name of the subjects?
A. Yes.
Q. Date of birth?
A. Yes, sir.
Q. Parents' names?
A. Yes, sir.
Q. Where they worked?
A. Yes.
Q. And as they were providing this information, you were writing it down in a notepad; is that correct?
A. Yes.
Q. Showing you what's been marked as Exhibit G, can you take a look at that exhibit, please. That's for identification.
A. Yes, sir.
Q. Are these -- what is this document, Exhibit G?
A. This is photocopies of my handwritten notes taken that morning.
Q. These are the notes you took contemporaneously with your interviews of these subjects?
A. Yes, sir.
MR. BERG: I'd ask that this be admitted as full, Judge.
MS. ROGERS: Objection?
THE COURT: What's the objection?

MS. ROGERS: Hearsay.

THE COURT: Overruled. This is G?

MR. BERG: Yes, your Honor.

THE COURT: Defendant's Exhibit G will be full.

MR. VOCCOLA: Your Honor, I would only object to a portion -- I don't object to the portion of the notes that pertain to defendant Roque, but as to Verdugo I would.

THE COURT: I understand your -- do these notes pertain only to -- I see they don't. I think you should take the last two pages off of -- you're only interested in notes as they pertain to your client, isn't that correct, Mr. Berg?

MR. BERG: Do you know what, Judge, I'll withdraw it as a full exhibit for now. If there's a need -- if there's not a need for that portion, then I'd have no objection to taking it out, but it might become relevant at some point during my examination.

THE COURT: All right.

MR. BERG: May I approach the witness and show him the exhibit?

THE COURT: Yes.

Q. Looking at Exhibit G for identification, on the right-hand side towards the bottom, there's a notation made; is that correct, regarding Chacho and phones?

A. Yes.
Q. And in fact, it says: Chacho, phones, silver T-Mobile, isn't that correct?
A. That's correct.
Q. So at that time, you wrote that Chacho owned the silver T-Mobile, isn't that correct?
A. I did write that, however --
Q. Sorry. Go ahead.
A. However, I wasn't sure which one was Chacho at the time, and Roque was the one that identified himself as having the phone.
Q. So you were confused back then?
A. I was confused as to who Chacho was.
Q. In fact, you testified about this matter previously, isn't that correct?
A. Yes, sir.
Q. In this courtroom?
A. Yes, sir.
Q. And you were under oath?
A. Yes, sir.
Q. And you knew it was important to be as accurate as possible in your testimony, isn't that correct?
A. Yes, sir.
Q. On that day, you testified, initially, that Chacho owned that silver T-Mobile, isn't that correct?

A. I don't recall that, sir.
Q. Would it refresh your recollection to look at your testimony from that day?
A. Yes, sir.
MR. BERG: Do you want this marked as an exhibit, Judge?
THE COURT: No, you don't need to. Just show him the testimony and see if that refreshes his recollection.
Q. I'd ask you to read lines 14 through 17.
A. Yes, sir.
Q. Does that refresh your recollection about what your testimony was that day?
A. Yes, sir.
Q. And in fact, on that day, you testified that the phone belonged to Chacho, isn't that correct?
MS. ROGERS: Objection.
THE COURT: Overruled.
A. I believe it says I thought it was Chacho's. Let me see how it's worded.
THE COURT: Let's do this. Do it this way. Do you have an extra copy of that?
MR. BERG: Yes. I have one extra copy.
THE COURT: Use the document camera. Put that page on the camera only to the witness and attorney.

Q. I'm going to direct your attention --

THE COURT: Just a second. I'll allow you to read from the top of the page right down to the bottom and read -- ask him if you asked him those questions and he gave those answers.

Q. In your testimony, in line 3, isn't it a fact you were asked about a silver T-Mobile phone?

A. Yes.

Q. And you were asked to read your notes; is that correct?

A. Yes.

Q. And when you were asked to read your notes, you said that your notes stated --

THE COURT: No. Just go through the questions and answers, and he can say if that was his testimony.

Q. Did you testify when asked: "Can you read that because I'm having trouble," that that note indicates Chaco's phone, silver T-Mobile?

A. Yes. That's what's in my notes.

MS. ROGERS: Objection.

THE COURT: What's the objection?

MS. ROGERS: I believe the Court instructed Mr. Berg to start at the top of the page.

THE COURT: That's what I want you to do. Put the question on the previous page, start with that

question and just read the questions and the answers.
Q. In your testimony, you were asked, specifically on line 25: What did you observe? And you responded: Roque raised his hand and said that's mine. Something to that effect.
Is that correct?
A. Yes, sir.
Q. And then --
THE COURT: The easiest way to do this is to say did I ask you the following questions, and did you give the following answers, and then read the whole thing.
Q. Did I ask you, in fact, on page one of your notes, there's something about a phone, a silver T-Mobile?
A. Yes.
Q. And you responded yes, correct?
A. That is correct.
Q. And then did I ask you can you read that because I'm having trouble?
A. Yes, sir.
Q. And you responded: Chaco's phone, the silver T-Mobile.
A. That's correct.
Q. And I asked who is Chaco; is that correct?
A. Yes.
Q. And you answered: Chaco is a person that Agent

Naylor had informed me that they had interdicted in some manner in the investigation and that it was relevant; is that correct?
A. That's correct.
Q. And then you were asked: Could that be Chacho; is that correct?
A. Correct.
Q. And you answered: Could be Chacho.
A. That's correct.
Q. And in that exchange, you were indicating that Chaco in your notes might have actually been misspelled Chacho; is that correct?
A. That's correct.
Q. And then you were asked: Your notes indicate that the phone, the silver T-Mobile phone belongs to Chacho; is that correct?
A. Regards to my testimony on that date, that's exactly what I said.
Q. And you testified under oath that the answer was yes to that question?
A. Yes, sir. It could be Chaco.
Q. That was your testimony that day?
A. That's what it says right there.
Q. But you're saying now that was a mistake; is that correct?

A. No. I said it could be Chaco; it could be the other guy. But I indicated in my notes the phone belonged to Roque. I knew who Roque was. He just raised his hand. That's why I put the phone right next to his name.
Q. But your notes say Chaco?
A. I didn't known who Chacho was that day.
Q. You were confused about who was who, who had the nickname Chacho?
A. That's correct.
Q. But you didn't indicate that in your previous testimony when you were in here?
A. You didn't ask me.
Q. No. I asked you if the phone belonged to Chacho, and you said yes.
A. You asked me could it belong to Chacho. Yes, it could have been belonged to Chacho. I mean, who Chacho was.
Q. Now, you also testified that your standard question was where a person works, correct?
A. Yes, sir.
Q. And isn't it a fact that when you made the notes you never indicated that Fernandez-Roque -- your notes do not indicate that he told you any place of employment; is that correct?

A. They're not listed in my notes, no.
Q. You didn't put it in your notes?
A. No.
Q. Yet for at least for one of the other people you interviewed, you did have employment information in your notes; is that correct?
A. Yes, sir.
MR. BERG: No further questions -- I'm sorry, Judge. One moment.
No further questions, Judge.
THE COURT: Thank you. Mr. Voccola?
CROSS-EXAMINATION BY MR. VOCCOLA
Q. Good afternoon, Agent Arnold.
A. Good afternoon, sir.
Q. Agent Arnold, I believe you testified you were asked to see if some type of immigration charges could have been lodged against my client, Mr. Verdugo, am I correct, sir?
A. Yes, sir.
Q. And did you have any success in lodging any type of immigration charges against my client, sir?
MS. ROGERS: Objection.
THE COURT: What's the objection?
MS. ROGERS: Relevance.
THE COURT: I'll sustain the objection.

MR. VOCCOLA: I understand, your Honor, but I believe that was brought up on direct.

THE COURT: Come forward.

(Side-bar conference.)

THE COURT: Listen, I understand how you think -- I'm inclined to let you do that. The problem with that is it puts in juxtaposition between your client as a citizen and his client as a non-citizen. I thought, when we began the trial, we agreed and the Government agreed they were just not going to go there, not going to make this an issue. Now, by doing this, you're making it the issue. So how do I deal with that?

MR. BERG: I would like to say, Judge, that I'm caught quite by surprise by this line of questioning and it's highly prejudicial to my client.

THE COURT: So I think that you're all kind of getting into some dangerous testimony here.

MS. ROGERS: Your Honor, I would like to point out that my objection is also he's not entitled to put before the jury whether the success -- the form of the question is wrong, but, also, it's not relevant to this case.

THE COURT: You put on an immigration agent and you asked him questions about the kinds of questions

that he asks in order to determine status and then you just leave it out there. So then you come in and say it's not relevant. I mean, I agree, it probably isn't relevant, but you asked him questions that started to bring it into issue.

MS. ROGERS: I believe I did with regard to Mr. Verdugo. I asked about the Miranda with Mr. Verdugo. With Mr. Berg's client, it's relevant.

THE COURT: You got to that, but you asked him a number of preliminary questions about -- you know, you asked him a question in which he gave a response that was about the immigration status of these folks.

MR. VOCCOLA: Your Honor, my only point is he responded to a question posed by the Government, and he said, I was asked to see if any immigration charges could be lodged against these men. It's already been brought out in the testimony. I'm simply following up on that.

THE COURT: Here's the way I'm going to deal with it. The way we started out in this trial was that immigration status was not relevant. And I don't want you making it an issue, which then jeopardizes the co-defendant. That's how we started. Everyone is entitled to the protections of the law regardless of status. I think that's what I have to -- just take

that line and tell the jury that and not go there with either defendant.

MR. VOCCOLA: I'll move on to another area.

THE COURT: Okay.

(End of side-bar conference.)

THE COURT: Ladies and gentlemen, I'm just going to give you an instruction at this point and that is as follows: It is irrelevant to the determination of whether the defendants are guilty or not of the charges in this case, what their legal status is. That is, whether they are a citizen or not a citizen. And I can tell you that, in this case, you can assume in this case that the defendants may be a citizen or may not be a citizen. The point is that you can't consider that in determining the question that you have to determine. It's not relevant, and I'm not going to let either the Government or the defendants get into the issue of who's a citizen and who's not a citizen. It's not relevant. All right?

So I'm instructing you on that now, and you'll hear me give instructions at the time that I give you your final instructions that you're not to allow any biases or feelings about any other issue influence your deliberations in this case, and I'll reemphasize that when I give you those instructions.

So you can move on to another area, Mr. Voccola.
MR. VOCCOLA: Thank you, your Honor.
BY MR. VOCCOLA: (Continuing)
Q. Agent Arnold, you prepared documents with respect to your participation in this case, am I correct, sir?
A. I started to prepare some documents.
Q. Excuse me, sir?
A. I started to prepare some documents, sir.
Q. Did you prepare information for a document that was reviewed by a person by the name of Tahar Armed, sir?
A. I began to document it and never completed it. Tahar Armed used that information to help prepare his documentation.
Q. So you provided information that was provided to an individual by the name of Tahar Armed, am I correct, sir?
A. Yes, sir.
Q. And you prepared information to the effect in that document --
MS. ROGERS: Objection.
THE COURT: What's the objection?
MS. ROGERS: He's using another individual's document and attempting to impeach this witness.
THE COURT: I'm not sure what you're getting at

here. Reask your question. I'm not really clear what you're asking.
Q. You testified at an earlier proceeding, sir, that you prepared a report that would be used in a possible immigration proceeding, am I correct, sir?
A. No, sir.
Q. You don't remember testifying under oath, sir, that you prepared a document that you thought may be used in immigration proceedings, sir?
A. You said report, sir. You didn't say document.
Q. Excuse me. I'm confusing document with report. Which is it, sir, a document or report in your opinion?
A. I began producing a document that was supposed to be used in immigration proceedings.
Q. A document.
MR. BERG: Can I confer with Mr. Voccola, please, Judge?
THE COURT: Yes.
Q. And in that document, sir, you specifically delineated that there were surveillance units that observed 29 kilograms of cocaine being delivered by two other males, am I correct, sir?
MS. ROGERS: Objection.
THE COURT: Overruled.
A. Yes, sir. I would have to -- and I say that not

having read the document.
Q. Are you denying the fact, sir, that you prepared a report that said that 29 kilograms of cocaine was delivered by two other males?
A. Saying report or document?
Q. Document, sir.
A. I did prepare a report. I haven't read the narrative that you're referring to.
MR. VOCCOLA: Your Honor, if I could have this document marked for identification purposes only, please.
THE COURT: Yes.
Q. Agent Arnold, I'm handing you a copy of a document which has been marked Defendant's G for identification. I would ask you to look at the --
THE COURT: H.
Q. H for identification. I would ask you to look at the bottom third of that document to see whether or not it refreshes your recollection as to reporting that there were two other males observed delivering 29 kilograms of cocaine?
MS. ROGERS: Objection.
THE COURT: Overruled.
MR. VOCCOLA: If I may approach the witness, your Honor.

THE COURT: Yes.
A. Okay.
Q. Have you had time to review, sir?
A. Yes, sir.
Q. Do you agree, sir, that you reported that there were two other males who were observed delivering 29 kilograms of cocaine, according to that report, sir?
A. This record of reportability and admissibility of alien, which isn't a report, it's a narrative, I did begin. And that's the beginning of that narrative, which Tahar Armed never altered. It wasn't a final draft. It wasn't intended to be a final draft.
Q. You prepared that information, am I correct, sir?
A. For the most part, yes, sir.
Q. And that information was given to an individual by the name of Tahar Armed, am I correct, sir?
A. Yes.
Q. And you remember doing that, am I correct, sir?
A. Yes, sir.
Q. Isn't it a fact that it was James Connelly and Mark Tully who you talked to, to gain the information that you prepared with respect to that event that you memorialized in writing?
A. Yes, sir.
MR. VOCCOLA: No further questions, your Honor.

THE COURT: Redirect.

REDIRECT EXAMINATION BY MS. ROGERS

Q. Looking at Defendant's H for identification, is that a formal report that you reviewed?
A. No, ma'am.
Q. Is it your report in any sense of the word?
A. No, ma'am.

MS. ROGERS: No further questions.

THE COURT: Very well. Any recross?

MR. BERG: No, your Honor.

THE COURT: Recross?

MR. VOCCOLA: No, your Honor.

THE COURT: Agent Arnold, your testimony is complete. You may step down.

THE WITNESS: Thank you, your Honor.

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

______________________________________

Anne M. Clayton, RPR

May 23, 2008

________________________________________

Date