IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * CRIMINAL ACTION
USA * 07-100
*
VS. * NOVEMBER 20, 2007
*
OMAR ALTAMIRANO-NUNEZ * PROVIDENCE, RI
* * * * * * * * * * * *

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(CHANGE OF PLEA)

APPEARANCES:

FOR THE GOVERNMENT: MARY ROGERS, ATTY.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT: EDWARD C. ROY, JR., ESQ.
Federal Defender's Office
10 Weybosset Street
Providence, RI 02903

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

THE COURT: Good afternoon. This is United States versus Altamirano-Nunez.

Let's have counsel identify themselves for the record, please.

MS. ROGERS: Mary Rogers for the United States.

MR. ROY: Good afternoon, your Honor. Edward C. Roy here for the defendant, Omar Altamirano-Nunez.

THE COURT: Mr. Nunez, would you please stand and be sworn in by the clerk.

OMAR ALTAMIRANO-NUNEZ, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE DEFENDANT: Omar Altamirano-Nunez.

EXAMINATION BY THE COURT

Q. Mr. Nunez, you've been sworn in by the clerk. I'm going to ask you a series of questions. You're expected to tell the truth in response to my questions. If you fail to tell the truth, it could result in additional charges against you for perjury or for making a false statement. Do you understand that?
A. Yes.
Q. Would you state your name again, please.
A. Omar Altamirano-Nunez.
Q. How old are you?

A. Twenty-eight.
Q. And how far did you go in school?
A. Ten years.
Q. Where was that?
A. In Mexico.
Q. Have you been treated recently for any mental illness or addiction to narcotic drugs of any kind?
A. No.
Q. Are you currently under the influence of any alcohol or drugs of any kind?
A. No.
Q. Have you received a copy of the indictment in this case, that is the Government's written charge against you?
A. Yes.
Q. And did you have an opportunity to read that indictment or have it read to you?
A. Yes.
Q. And did you have an opportunity to have any questions that you might have about the contents of the Government's charges against you answered by your counsel, Mr. Roy?
A. Yes.
Q. And you've also signed a plea agreement in this case; is that correct?

A. Yes.
Q. And did you have an opportunity to read that plea agreement or have it read to you before you signed it?
A. Yes.
Q. And do you feel you understand all of the terms of the plea agreement?
A. Almost all of them.
Q. Okay. We're going to go over the terms of the plea agreement here today, but I want to make sure that if there's anything that you don't understand about the plea agreement, that if I don't cover it, I want you to tell me what it is. Okay?
A. Okay.
Q. And have you had a chance to ask your questions about the plea agreement to Mr. Roy?
A. Yes.
Q. And has he tried to answer all of your questions?
A. Yes.
Q. Are you fully satisfied with the representation that you've received in this case from Mr. Roy?
A. Yes.
Q. All right. Now, has anyone made any other promises to you of any kind other than what is contained in the plea agreement in order to get you to plead guilty in this case?

A. No.
Q. Has anyone threatened you in any way in order to force you to plead guilty?
A. No.
Q. Now, you understand that the contents of the plea agreement are only recommendations to the Court. What that means is that once I accept your plea of guilty I may accept these recommendations or I may not. And if I choose not to accept the recommendations contained in the plea agreement, you do not get the chance to go back and change your plea once you've entered it. Do you understand that?
A. Yes.
Q. All right. Now, one of the terms of the plea agreement I want to cover with you specifically are the maximum penalties. Now, that is set forth in paragraph six of the plea agreement, and I'm going to go over those with you now.
The maximum penalties that may be imposed by law on Count I are as follows: Life imprisonment, a mandatory minimum term of ten years; a fine of $4 million; a term of supervised release of life, a mandatory term of five years; a mandatory special assessment of $100.
On Count II, a maximum term of imprisonment of

20 years; a fine of up to $250,000; a term of supervised release of four years; and a mandatory special assessment of $100.

On Count III, 20 years of imprisonment maximum; a fine of not more than $500,000, or twice the value of the monetary instrument or funds that were involved, whichever is greater; a term of supervised release of three years and a mandatory special assessment of $100.

So if all of these sentences were imposed consecutively, meaning back-to-back-to-back, then the maximum penalties would be as follows: Life imprisonment; a fine of $4,750,000; a term of supervised release of life, and a mandatory special assessment of $300.

So you understand that these are the maximum penalties that can be imposed under the law. That doesn't mean that this will be the penalty, but these are the maximum penalties. Do you understand that?

A. Yes.

Q. Now, have you had an opportunity to talk to Mr. Roy and maybe the Government about the Federal Sentencing Guidelines and how those guidelines operate?

A. With my attorney, I have, yes.

Q. Okay. And I'm just going to cover a few things about the guidelines. First of all, do you understand

that the Federal Sentencing Guidelines are not mandatory; they are advisory, and what that means is that the Court has to consider the guidelines that are determined to apply to your case but I do not have to follow them.

So what that means is that the sentence in this case may be within the guideline range that is found to apply to your case, or it may be above that range, or it may be below that range. But if the sentence that I impose is higher than the guideline range or higher than what you think it should be or higher than anyone has told you it will be, you don't get the chance to go back and change your plea of guilty once you have entered it. Do you understand that?

A. Yes.

Q. And also, I just want to be sure that you understand that anything you have been told about how the guidelines will apply to your case are just estimates. We won't know exactly how the guidelines apply until after the Department of Probation has had the opportunity to conduct a presentence investigation and issue a presentence report, and then you'll have an opportunity to review that report as will the Government. If there are objections, you can file them, and I'll make decisions about those objections

and ultimately make a determination as to how the guidelines apply to your case.

But anything you've been told, as I said, are estimates. So if it turns out that the presentence investigation yields a higher guideline range or if my rulings on certain objections come out differently than what you think they should, again, you don't get to change your plea once you've entered it. You understand that?

A. Yes.

Q. Now, do you understand what's meant by supervised release, which I mentioned a few minutes ago? Do you understand what supervised release is?

A. No.

Q. Do you understand what probation is?

A. No.

Q. All right. Well, supervised release and probation is a period of time after you're released from prison. So let's say there's a prison term in this case, there's a mandatory minimum of ten years, so your sentence will be somewhere from ten years or above, and that's in prison. Once you're released from prison, there'll be a period of time where you're required to report to the Office of Probation, and you'll be required during that period of time, which could run as

long as the rest of your life, to follow certain conditions. All right? And one of those conditions in your case would be that if you're deported at the end of your prison term, you would agree or you would be required not to reenter the United States. And if you did reenter the United States, then you could be put immediately back in prison. Do you understand that?
A. Yes.
Q. Now, you also have, I believe, you have waived your right to appeal in this case if the sentence that I impose is within the guideline range or below.
What that means is where you might have the right to challenge a sentence as unreasonable, you're giving that right up in this plea agreement as long as the sentence is within the guideline range or below.
Now, you understand that you're giving that right up?
A. Yes.
Q. You also understand there's no such thing as parole in the federal system so whatever sentence you're given is the sentence that you will serve. Do you understand that?
A. Yes.
Q. All right. I'm going to go through the rights that you are giving up by pleading guilty in this case,

but before I do that, I want to ask you is there anything in this plea agreement that you're confused about or you want to ask a question about at this time?
A. No. I'm fine.
Q. Are you sure? At the beginning, you said there were some things you weren't sure if you understood them.
A. No. I had doubts about the money laundering thing only.
Q. Okay. So what are your doubts? What do you mean?
A. No. It was just that I was doubting as to whether I should plead guilty to that because I felt innocent.
Q. All right. Well, have you had the chance to talk about that with Mr. Roy?
A. Yes.
Q. Okay. And I take it you've made the decision about wanting to plead guilty to that offense; is that right?
A. Yes.
Q. Okay. Now, I'm going to go through the constitutional rights that you have as a defendant because you're giving up each and every one of these rights by pleading guilty to these offenses. These rights are set forth in the plea agreement in paragraph eight, but I want to go through them with you now, make

sure you understand what rights you're giving up.

First of all, you have the right to plead not guilty to the offenses that you are charged with and to persist in that plea to a trial by jury. Do you understand that?

A. Yes.

Q. And in a trial by jury, you would be presumed to be innocent of the charges against you, and it would be the burden of the Government to prove your guilt beyond a reasonable doubt. Do you understand that?

A. Yes.

Q. And in a trial, you would have the right to be represented by counsel, Mr. Roy; to see and hear all witnesses who would testify against you and have them examined by Mr. Roy. Do you understand that?

A. Yes.

Q. And at trial, you'd have the right to testify in your own defense if you wished to do so, or you could decide not to testify. And if you chose not to testify, the Government could not use that against you to try to prove your guilt. Do you understand that?

A. Would you repeat that again, please.

Q. Sure. In a trial, you could choose to testify in your own defense if you wanted to do so, or you could decide not to testify and exercise what is known as

your right to remain silent. And if you chose to remain silent, the Government could not use that silence to try to prove your guilt of the crime. In other words, the Government cannot use your silence against you. Do you understand that?
A. Yes.
Q. Okay. Now, also, you'd have the right at trial to use the power of this Court to subpoena witnesses or documents to compel people or things to come to court that you think might be helpful to your defense. Do you understand that?
A. Yes.
Q. Now, by pleading guilty to these offenses, you're giving up each and every one of these constitutional rights that I just described to you, and you're saying to me that you do not want a trial in this case. Is that what you want?
A. Yes.
THE COURT: All right. I'm going to ask the attorney for the Government, Ms. Rogers, at this time to outline the legal elements of the offenses that you're charged with and then she's going to outline the facts that the Government says it would prove if this case were to go to trial. What I want you to do is listen very carefully to the facts that she describes

because when she's done I'm going to ask you if you agree that those are the facts of this case. You can sit down while she does this.

MS. ROGERS: The elements as to Count I, which is conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine, are that the agreement specified in the indictment existed between at least two individuals, and that their agreement was to possess with intent to distribute or to distribute that cocaine, and that the defendant willfully joined that agreement.

Count II is illegal reentry into the United States. The elements are that the defendant was found in the United States after a deportation proceeding where he was advised of his right to appeal, that he's not a U.S. citizen, and he did not seek, nor did he gain the permission from the United States Attorney General to return to the United States.

The third count is conspiracy to commit money laundering. The elements are that the defendant conspired with others knowing that the cash was derived from illegal acts, in this case drug distribution; that he did so with the intent to further the drug distribution; and that he intended that the cash be transported out of the United States to avoid reporting

requirements.

The facts that the Government would present to establish these three charges, if the matter were to go to trial, are as follows: As to the money laundering, that in November of 2006, the Drug Enforcement Administration, also known as DEA, in San Diego intercepted communications between an individual called Primo, he was later identified as Alexander Rodriguez Sahagun, and a Juan Casillas. These communications indicated that Juan Casillas was to fly to Rhode Island to pick up cash drug proceeds from cocaine distribution for Sahagun and return with the money to California.

On November 27th, 2006, DEA observed Casillas purchase a new cell phone and program telephone numbers into it, and also meet to obtain a truck from co-defendant Omar Altamirano-Nunez and a co-conspirator named Victor Bravo Rodriguez, who has been since indicted in the District of Massachusetts on similar charges.

The Rhode Island State Police later pulled over the truck driven by Casillas for a traffic violation. The DEA seized $129,200, which was secreted in a hide inside the truck. Casillas was later released by law enforcement but given a contact number to call regarding the truck.

On December 5th, 2006, a Jonathan Magdellano, another co-conspirator, who is also currently indicted in the District of Massachusetts on related charges and was the owner of that truck, contacted that number and attempted to obtain the truck.

He was told by the police that the $129,200 had been seized from the truck in a hidden compartment. Magdellano denied any knowledge of it claiming that the driver, Casillas, must have put it in there.

The defendants Altamirano-Nunez and Casillas knew that the drug proceeds were to be transported to California.

In February of 2007, DEA Providence received further information from the San Diego wiretap that cocaine was being transported to Rhode Island under the direction of Estore Placencia. The cocaine was transported to Rhode Island on a weekly basis and then distributed in Rhode Island by Altamirano to a Dominican trafficking group.

Based on this information, the DEA obtained court authorization in the District of Rhode Island to intercept communications regarding the organization. Based on information from the wiretaps, on May 30th, 2007, at approximately 2:30 a.m., 29 kilograms of cocaine were seized on the highway outside of

Springfield, Massachusetts.

The defendant was arrested along with two co-defendants, Idelfonso Betancourt-Rodriguez, a/k/a Chacho, and Rafael Hernandez-Roque.

Wire intercepts, which were corroborated by cell site information and surveillance demonstrated that Altamirano was in Rhode Island arranging to pick up the 29 kilograms of cocaine with his co-defendants, Betancourt-Rodriguez and Hernandez-Roque and pick up the cocaine from Adolfo Verdugo.

Altamirano driving a Honda van followed by co-defendants Betancourt-Rodriguez and Hernandez-Roque, who were driving in a Jeep Cherokee, drove from Providence, Rhode Island to a motel in Springfield, Massachusetts where the three men checked into a room in the early morning hours of May 30th, 2007.

The intercept showed that after communicating with co-defendant Adolfo Verdugo, the men went to pick up the 29 kilograms of cocaine.  Subsequent intercepts indicated that a tractor-trailer truck contained the cocaine.

Verdugo, using a cell phone that he later admitted was his, directed Altamirano to a rest area. Altamirano replied that, quote, "The guy is with me and has a Cherokee."

This was the vehicle driven by co-defendants Betancourt-Rodriguez and Fernando Roque. Altamirano then called Chacho and told him to park between two trucks in a rest area and shut everything off. The Cherokee then exited into the rest area as the defendant's Honda continued past the rest area and took the next exit on the highway, number 17.

The Cherokee containing the two co-defendants parked between two tractor-trailer trucks and took -- the Cherokee was there for approximately one minute, at which time the cocaine was transferred.

It then reentered the highway as the Honda with the defendant made its way back onto the highway from a southbound entrance at number 17.

Altamirano then called Chacho and asked him if he had passed Exit 17 yet and directed Chacho to pass him. Then Altamirano called Verdugo and asked if everything was okay, to which Verdugo replied, "It's all done."

The Massachusetts State Police stopped the Cherokee on the highway. The police noted an unzipped, open black duffle bag in the rear seat with 29 kilograms of cocaine.

The police were able to see the wrapped kilograms of cocaine in the bag and smelled the

chemical smell associated with cocaine.

The cocaine was sent to the Massachusetts State Police crime laboratory where it was tested by a chemist who determined that the substance was cocaine and the net weight was 29.09 kilograms or roughly 64 pounds.

The police also stopped Altamirano in the Honda, which had been ahead of the Cherokee on the highway. A pat frisk of Altamirano revealed the room key from the Springfield motel. Inside the vehicle on the front seat were the two telephones for which wire intercept authority had been granted. An inventory of the Cherokee located the cellular telephone, which later Chacho admitted belonged to him, and on Roque the police found another cellular telephone.

At the same time, the rest area was sealed off so that no vehicles could leave. Inside the tractor-trailer, police identified Verdugo and another Spanish-speaking male. Both men spoke both Spanish and English. A drug dog was run over the tractor and the trailer but did not alert.

Four cell phones were taken. DEA Task Force Agent Michael Naylor dialed the telephone number that had been in communication with Altamirano on May 30th, 2007. The phone located in the center console of the

tractor rang at that time. Verdugo later admitted to the police that it was his phone.

The defendant Altamirano is a native and citizen of Mexico. He was arrested in Nebraska on November 4th, 2003. At that time, hidden in a spare tire, the police found $129,286 in cash. Both the money and the vehicle were seized.

The defendant was not charged but was deported after a hearing on November 24th, 2003, to Mexico.

On January 25th, 2007, the defendant attempted to cross the San Ysidro port of entry with immigration documents that belonged to another individual. The defendant stated he had purchased the documents in Tijuana for $500. The defendant was subsequently removed.

A fingerprint expert compared the fingerprints of this defendant with the print on his 2003 deportation warrant and concluded that they are from the same individual.

A review of the Immigrations and Customs Enforcement files show that there is no record of the defendant applying to the U.S. Attorney General for permission to reenter this country nor of his receiving permission to enter this country.

THE COURT: I have just a couple of questions.

Is that it?

MS. ROGERS: Yes.

THE COURT: All right. At one point, you referred to someone by the name of Nunez, and then you were referring to the defendant as Altamirano. Is the Nunez that you refer to the defendant?

MS. ROGERS: Yes. His last name is Altamirano-Nunez.

THE COURT: But you seemed to switch. Earlier in the recitation you were calling him Nunez, I believe, and then later you seemed to call him Altamirano. I just want to be sure that's the only person we're talking about here is any time you used the name Nunez or Altamirano, you were referring in both cases to the defendant.

MS. ROGERS: Yes.

THE COURT: All right. Mr. Altamirano-Nunez, would you please stand.

Q. Now, that was kind of a long description of the events in this case. Did you understand everything that Ms. Rogers described as the facts of this case?

A. Yes.

Q. Now, do you agree that those are the facts of this case?

A. Not everything.

Q. Okay. I want you to tell me what parts of that recitation that you don't agree with?
A. The things related to Placencia. I had nothing to do there.
Q. So anything having to do with Placencia, you didn't have anything to do with that?
A. Not that I know. Maybe indirectly. I used to talk to him because we were friends at one time.
Q. Okay. What else do you not agree with?
A. It says there that he was the one who would send drugs weekly. I don't accept anything relating to Placencia. The rest, I accept.
THE COURT: Okay. Ms. Rogers?
MS. ROGERS: Your Honor, I don't believe it makes a difference to any admissions of guilt. That particular paragraph I can have stricken from the record. It was a reference to what authority or probable cause was used to support the permission to wiretap this defendant's phone. So I'm not saying that he has to admit that he had knowledge of that information.
THE COURT: All right. I was just looking for that paragraph. Where is that?
MS. ROGERS: It's approximately half way through the prosecution version.

THE COURT: Okay.

MS. ROGERS: Perhaps a third of the way through. It immediately follows the facts that support the money laundering charge.

THE COURT: Okay. So if we forget about the part that she described about transporting cocaine to Rhode Island under the direction of Placencia, if you just leave that out of this, you're saying that you agree with all the rest of the facts that Ms. Rogers described?

A. Yes.

Q. Now, before I ask you how you wish to plead, I want to be sure that you understand, I should have covered this earlier, that you understand when it comes to the penalties in this case that there's a mandatory minimum term of imprisonment. What that means is that regardless of what the presentence report says and regardless of what anyone may argue or what I may think, the penalty for that count must be at a minimum ten years of imprisonment.

So do you understand that there is a minimum term of incarceration in this case of ten years? You understand that?

A. Yes.

Q. All right. Now, I'm going to ask you how you wish

to plead to the charges against you, guilty or not guilty?

A. Guilty.

THE COURT: It is the finding of this Court in the case of the United States versus Altamirano-Nunez that the defendant is fully competent and capable of entering an informed plea, that the defendant is aware of the nature of the charges against him and the consequences of his plea, and that his plea of guilty is a knowing and voluntary plea supported by an independent basis in fact and containing each of the essential elements of the offense. His plea is, therefore, accepted, and the defendant is hereby adjudged guilty of those offenses.

I am going to set sentencing down in this matter for Friday, February 29th, 2008 at 11:00 a.m.

In the meantime, Mr. Altamirano-Nunez, the Office of Probation will be preparing a presentence report, as you know. That report is important for me to get a full understanding of all aspects of the case. So I'm going to ask that you cooperate fully with the probation officer who will be preparing the presentence report.

All right. Is there anything further that we need to take up?

MS. ROGERS: No, your Honor.

MR. ROY: Nothing, your Honor. Thank you.

THE COURT: All right. Thank you. We'll be in recess.

(Court concluded at 3:50 p.m.)

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

______________________________________

Anne M. Clayton, RPR

JUNE 12, 2008

________________________________________

Date