IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
* * * * * * * * * * * *   * CRIMINAL ACTION
USA                       * 07-100
                          *
VS.                       * APRIL 10, 2008
                          *
ADOLFO VERDUGO and        *
RAFAEL FERNANDEZ-ROQUE    *
                          * PROVIDENCE, RI
* * * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(CLOSING ARGUMENTS)

APPEARANCES:

| | |
|---|---|
| FOR THE GOVERNMENT: | MARY ROGERS, ATTY.<br>U.S. Attorney's Office<br>50 Kennedy Plaza<br>Providence, RI 02903 |
| FOR THE DEFENDANT ADOLFO VERDUGO: | JOSEPH J. VOCCOLA, ESQ.<br>454 Broadway<br>Providence, RI 02903 |
| | JOHN F. LUSI, ESQ.<br>29 Okie Street<br>Providence, RI 02908 |
| FOR THE DEFENDANT RAFAEL FERNANDEZ-ROQUE: | ANDREW H. BERG, ESQ.<br>Sammartino & Berg<br>128 Dorrance Street<br>Suite 400<br>Providence, RI 02903 |
| Court Reporter: | Anne M. Clayton, RPR<br>One Exchange Terrace<br>Providence, RI 02903 |

Proceeding reported and produced by computer-aided stenography

MS. ROGERS: Good afternoon, ladies and gentlemen. This is my opportunity to give the Government's summary of the evidence that has been presented to you.

In this particular case, as you've heard, the indictment charges these defendants, Adolfo Verdugo, and Rafael Fernandez-Roque, along with Juan Carlos and Chacho, who is also Idelfonso Betancourt, in Count I with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine. So in this trial, the Government must prove that there was an agreement or a conspiracy to possess cocaine and possess enough cocaine that they intended to redistribute it to others.

The Government's proof in this case is only that they made an agreement to do this criminal act, but you're certainly entitled to, and the Government presented you evidence of their actual possession to prove that they entered into this agreement.

The Government must prove these charges, as it must in all cases that we present, beyond a reasonable doubt. Now, we all know what the word "reasonable" means, and the Government does not have to prove this case beyond all doubt, beyond a shadow of a doubt. It's beyond what's reasonable. And speculation, which

the Government admits is all the defendants have in this case, is not doubt.

So how does the Government show an agreement existed between a group of individuals? Well, we can't read minds so we show this agreement or the fact that they agreed to distribute drugs by showing their actions, what did they do in furtherance of the agreement; and also, in this case, we have the benefit of having intercepted their phone calls and the wiretap. So what they said.

Let's start with what we know. There's no doubt that Mr. Roque and Chacho were caught on the early morning hours of May 30th, 2007 with 29 kilograms of cocaine in the back seat of the car. No one is disputing what was in that duffle bag. No one's disputing that it wasn't cocaine, a controlled substance; and no one's disputing that it weighed five or more kilograms.

In this case, the toxicologist testified and showed to you undisputed that it was 29 kilograms of cocaine, 74 percent purity, high-quality cocaine with no cut, no diluent, as she said, no adulterants.

So we know from the start beyond a reasonable doubt that a drug deal took place, and we know that Chacho and Mr. Roque were in possession of the drugs,

the fruits of this transaction.

So the only thing left is to determine what role each of these two defendants played. And we look at the evidence; we have a tremendous benefit of looking at it in hindsight. Hindsight is often 20/20.

Now, the evidence that the Government has in hindsight are the telephone calls, the contemporaneous surveillance that accompanied the phone calls, photographs, the drugs, and the witnesses testimony.

So we start with a series of conversations that took place that the Government intercepted. We start with the fact that the individuals went to great lengths being cryptic, to be vague, to be indecipherable so that people would not understand what they were saying. They used code. And even when they didn't use code, they still were vague.

The evidence focuses for a limited time period in this particular case, you heard the wiretap was up for three months, but the focus of this particular trial starts on May 26th, 2007 when the first phone call presented, phone call number one came in.

Mr. Verdugo, they don't know who he is at that point in time, the evidence shows Mr. Verdugo called Juan Carlos and tells him get ready for me, a little dinner over there by Monday more or less, I think. And

Juan Carlos tells Mr. Verdugo, We're ready. The code is obvious once it's explained, and it's easy to understand once all the events have already taken place and are in front of you. But think to yourself what is reasonable. Which one of us, what individual reasonably talks like that unless you don't want to be overheard. And if you are overheard, you don't want to be understood.

If it's something innocent, then just say it. But they don't, because they don't want any other parties to understand.

For example, in the same call Mr. Verdugo says, If you want, the same day I get there, or if you want to wait until two days later after I arrive, and Juan Carlos says, What, I don't understand.

Does Mr. Verdugo's reply become any clearer? Not unless you understand the code. He states, On 90 because I'm a little more to the west. Now, when somebody says I don't understand what you just said, why don't you just reply, I'm going to be in Hartford where 91 and 84 are. But he has to stick with the code.

These individuals are large-scale drug traffickers. They're dealing in what you heard Agent Naylor testify to, cost, value, wholesale is worth over

half a million dollars, up to $800,000. So there's a very good reason for them using the code.

He doesn't say, Meet me in Hartford. I don't want to drive all the way to Providence. Remember, there's no problem here with the translation of this transcript. It's purely a matter of what did they mean. And Juan Carlos says, I'll check it out the next day.

Again, this is circumstantial evidence of what these individuals are doing that's later confirmed by the actual cocaine that's seized.

A man from Mexico calls Juan Carlos and speaks of 29, the month of February brings 29. How many kilograms of cocaine did the detectives seize? Twenty-nine kilograms. That is one heck of a coincidence unless the code is correct.

And you heard Agent Naylor testify that suppliers often front part of the drugs. So what does I leave you in charge to get the medicine, because Juan Carlos, who will be getting the money, to pay for the drugs after they're delivered, and Juan Carlos assures the man in Mexico, And we're trying to have a surprise for you. What is the surprise? He's going to try and pay quickly this time. The man in Mexico replies, I'll leave you in charge. Why? Because Juan Carlos is in

charge here in Providence, Rhode Island.

Who was he in charge of? He was in charge of Mr. Roque, he was in charge of Chacho, he was in charge of other individuals who you hear him talking to in this intercept.

I won't go into all the calls. There's 23. But number three Juan Carlos tells Chacho that when he's concerned, has anyone called, he sometimes calls around two. And what time, when you look later finally on Tuesday night and actually it's now May 30th, Wednesday morning, does Mr. Verdugo call? He calls at 2:00 in the morning.

In another call, Juan Carlos assures Chacho, Don't get desperate, I'm still waiting. He calls he said Monday, but what day did Mr. Verdugo say he was coming in the other call? Monday, more or less.

When Mr. Verdugo calls on Tuesday, what does he ask Juan Carlos, Are you upset with me? He's a day late.

Mr. Verdugo then changes when Juan Carlos asks him, The same place we're going to meet? No, we'll go to where the Simpsons live.

Again, no, we're not going to Hartford. Let's go meet in Springfield, Massachusetts. That's what people do when you have an innocent conversation. But

when you have to protect this much value of cocaine, you use code. Would any of you give directions to somebody trying to find you where you're going to be using references to a TV show? Common sense tells us that in everyday common sense that when you're evaluating this case, that's not the type of conversation you have when you want someone to understand what you're talking about.

And again, common sense. You can all think of examples, perhaps you and your spouse were talking in front of your young children and you didn't want them to know what you're talking about so you try code. Sometimes you have to give up and ask the kids to leave the room or you do. But you're planning a surprise party and someone walks in the room that the surprise is for, again, you use cryptic, vague conversation to keep that a secret, because you don't want people to know what you're saying.

Now, call number six, this call Agent Naylor stated he changed his mind on the code, whether there was code. Again, hindsight is 20/20 because Agent Naylor just found out last Friday that Mr. Roque apparently was going to go to Newport. But focus on why did Agent Naylor listen and look at this call in particular in the first place. Two reasons. One, he

told you I'm a Newport detective and it caught my attention because Newport had never been involved in the surveillance, it had never been mentioned before. Did they mean Newport Avenue in East Providence?

But what made him focus on it additionally was it was cryptic. It's guarded, and it's also significant in what is not said.

Mr. Roque reminds him, this is at ten at night he calls and reminds him, I have to be in Newport at ten tomorrow morning, the three of us. He says Mr. -- to Juan Carlos, when he says, Keep your phone close, what does he need his phone close for? Because he's not sure when he's going to leave to head to Springfield. He has to go pick up the Jeep Cherokee from Roosevelt Avenue.

But Roque replies, when you look at call number six, when he says, Keep your phone close by so we can leave, you already said that. Look through the whole call. He doesn't say it anywhere in the phone call and he doesn't say it any time over the phone.

So what this tells us is these two men have talked. Mr. Roque and Juan Carlos have talked freely outside of these telephone conversations, and Mr. Roque knows he is going on a drug deal.

If he's so concerned about showing up for his

job the next morning, why doesn't he just say, What do you need me for anyway? That drive is almost two hours. They don't get there until one in the morning. Why doesn't Mr. Roque say, What's so important? Tell me, what do you need me to come along on this ride for? Because common sense, reasonable inferences, he knows what they're going to do, and he's agreed to go along.

And why does Juan Carlos want two people to go along? Because 29 kilograms, over half a million dollars worth, that's a lot of money, a lot of cocaine.

Now, you might think, well, why would Juan Carlos want two instead of one. The less people who know about this the better. Because Juan Carlos is the boss, Juan Carlos is the leader, and he doesn't want to get caught with the drugs. And there's less chance of one of his underlings pulling something if there's two of them together to keep each other loyal to him. Juan Carlos doesn't want to be caught with those drugs, and he wasn't caught with those drugs. He was caught in these telephone conversations. But that's what bosses do. He's in the real world sometimes. They leave their subordinates to take the risk, and they pay them to take the risk and that's what Juan Carlos did here.

And what does Juan Carlos do? He borrows a car. Why doesn't he save money on gas. They can all go up

in the minivan and drive up there together. But they don't go in one car because he wants a way to reduce the risk to himself. He borrows a car that he knows is insured and registered, again, reduce the risk that this venture is going to be caught by law enforcement.

Now, someone this calculating, this thoughtful on reduction of risk is not going to place poor Mr. Roque, an unwitting dupe, in that car. Because what happens? He runs a tremendous risk of the Jeep Cherokee, registered, license is in order, gets pulled over for speeding. Who doesn't speed on the highway.

And then Mr. Roque, when he's pulled over, he doesn't know what's going on, blurts out, oh, go ahead, search the car, we're not doing anything wrong. Or I don't know, Officer, what that bag with 29 kilograms is doing in the back of me. I don't know how it got there. Or I didn't know it was going to get there, but why don't you ask the guy in the minivan ahead. He's the one who asked me to come on this.

Again, Juan Carlos is not taking that kind of risk. Is that reasonable? And that's the standard, reasonable doubt here. The evidence here is beyond a reasonable doubt.

But what other evidence is so compelling? You've heard evidence the Jeep Cherokee pulled in

between two tractor-trailer trucks in the rest area. They turn off their lights, just as Juan Carlos told Chacho to do, and they leave. And the majority of the phone calls are to Chacho, who is driving. That makes sense. The boss wants to talk to the person that's doing the driving to tell him there's just split seconds as they're driving along trying to find that tractor-trailer, pull over, that's the rest area, go there. He pulls over, and they leave. They're there 60 seconds, the transfer takes place. No doors open on the driver's side of either the tractor-trailer or the Jeep Cherokee.

This is an example of compelling circumstantial evidence. The cocaine got in that Jeep Cherokee somehow.

One of the examples that I've heard over and over for circumstantial evidence is you go to bed, there's no snow on the ground, you wake up in the morning, the ground is covered with snow, you can conclude that it snowed overnight.

In this case, they leave the Econo Lodge. They drive to a rest area. That's the only place they stopped. You can conclude that that cocaine got in there the one time they stopped that Jeep Cherokee.

But Mr. Roque -- what is so compelling here is

the Jeep pulled out, and Mr. Roque, the passenger, called Juan Carlos and he says as little as possible. He says, "I'm ready." Juan Carlos goes, What? "I'm ready."

Mr. Roque didn't receive a phone call from Juan Carlos going, What are you doing? Where are you guys? You were behind me a minute ago and you disappeared.

He knows that he sent that Jeep into there. Roque doesn't call back and say, Hey, sorry, we took a wrong turn or stopped at the rest area for something. We're behind you. I'll catch up in a second. Or what in God's earth is in the back of this Jeep with me? What are you doing? He says, "I'm ready."

Why? Because this is his part of the conspiracy, this is evidence he's a willing participant. And he might not know every single detail. He certainly didn't know every single detail of what Juan Carlos did, or every single detail of what Chacho knows, but the conversations make it clear that Chacho actually knew how to get to Springfield better than even Juan Carlos knew, but he certainly knew the main goals of this venture, and he knew that they had accomplished what they left Providence to do when they pull out between those two tractor-trailers.

And he calls Juan Carlos and he tells him, "I'm

ready." Juan Carlos replies: Pass me. I'm driving very slowly.

All of these individuals must be pumped up with adrenaline. It's human nature, it's 4:00 in the morning or 3:30 in the morning hoping they're not going to get caught. It's embarrassing, too, because they know how illegal it is. And then what happens? Two minutes go by and Juan Carlos calls the driver, Chacho, and he asks if he's passed the 17. He want to know where they are, because two minutes must seem like an eternity for Juan Carlos. He wants to make sure Mr. Roque and Chacho do have those drugs and are coming back with him. And then Juan Carlos calls Mr. Verdugo to confirm everything's okay and Mr. Verdugo tells Juan Carlos, It's done.

Now, let's talk about voices. The evidence you have before you is that the agent, who is dedicated to this case, Agent Mike Naylor, worked on this case from the very beginning, and he listened to the calls. Even though they're in Spanish, he listened to them and got familiar with the voices. And he heard a call from Mr. Roque, again, that call six. It was on a new telephone number he hadn't seen before and it talked about Newport so that piqued his interest. And he listened to the call repeatedly, because why? Because

he had become familiar with the voices even though it's all in Spanish and he compared it and it didn't match anybody else who has called. And he tries to figure out how this fits in, but he knows this is one of the players for the deal that's going to happen that night. So that later when he hears Mr. Roque's voice at the Mass police station, he recognizes it.

Now, if I asked two people to take a ride at two in the morning, follow me in my car while I'm driving in this roomy minivan, and I'm going to direct you via cellphone where to drive, would your interest be piqued. Would you ask, Why are we driving separately? Why are we pulling in the rest area? Why aren't you pulling in the rest area?

They check into an Econo Lodge but they don't sleep there. Is Mr. Roque just the most unlucky person in the world, the person that he wanted him to take him to work the next day just happens to be doing a half a million dollar drug deal?

Again, circumstantial evidence is compelling here. Agent Naylor recognized Mr. Roque's voice at the station. And what does Mr. Roque say? He says he's only been in Providence for about a month. Well, the wire's been going about three months, and his voice is just showing up on it. That explains why we haven't

heard from him before. And he's a lower level courier, in a sense, or pick-up, so you wouldn't expect to hear him with the boss talking frequently. And as I stated before, call six shows you that these two individuals clearly spoke in person or on another line that the Government wasn't listening to.

Now, further, with regard to voices, Mr. Verdugo would have you believe that the voice that was heard on the tapes must be Mr. Arias-Cortez, his voice.

Again, this is sort of like walking into your kitchen after hearing a smash and your child is there with the cookie jar and it's broken and you say, What happened, and they name their imaginary friend did it.

What is the evidence before you? That Agent Naylor was with Mr. Verdugo for a period of over two hours in California, that he'd listened to the tapes repeatedly after to do a comparison. But that's not all. Agent Naylor's testimony is compelling, but Mr. Verdugo admitted that telephone was his, and he did it at the scene when he had no idea that anyone was wiretapping him, and he did it again at the police station and he signed a receipt for the only Cingular phone, the Cingular telephone that rang in Agent MacIsaac's hand while he was coming out of the cab that Agent Naylor called from Juan Carlos's phone since they

stopped it. The phone rings, the only Cingular. You can look at the phones; you can look at the receipts. There are two NEXTELs, there's a Verizon, and there's one Cingular.

Mr. Verdugo signed the receipt of the only two cell phones that have 909 area codes, the California area codes. The 909 number is what was intercepted talking to Juan Carlos.

Mr. Arias-Cortez signed a receipt for the other two telephones. You'll have that receipt in the jury room with you. Again, neither was a Cingular, neither was a 909 area code. So look at the evidence.

Now, Mr. Verdugo would have you believe, well, if you don't believe those aren't my telephones, then let's try theory number two. Mr. Arias-Cortez must have used them. He used the one telephone that communicated with Juan Carlos to talk about bringing drugs. He had two of his own phones with him. He didn't need to use somebody else's phone.

Now, the only evidence before you with regard to this is Sergeant Nartowicz. And he testified that I know that's not Arias-Cortez's voice on the recordings. What we know is that Mr. Verdugo and a 909 number and Juan Carlos. I'm not going to tell you I know it's Mr. Verdugo, but I know it's not Arias-Cortez. He had

a distinctive voice. So again, by process of elimination, we know it has to be Mr. Verdugo.

Now, some of you might wonder why DEA has testified. They were very concerned with these two individuals, Mr. Verdugo and Arias-Cortez, of not tipping them off about the wiretap because Boston was still looking at people, San Diego was still looking at people, or why would they tell them we're investigating looking for drugs.

Well, in a wiretap case, the evidence of what phones are being used are every bit as important as the drugs because without the wiretap phone, there's no way to show who's talking.

So they take a calculated risk. They seize all four phones. They don't just seize the one. That would have tipped Mr. Verdugo off. And Mr. Verdugo, Juan Carlos and Mr. Roque live in a world where they know there are snitches. They know there are confidential informants, and they would assume that in all likelihood someone tipped off the police. It happens all the time. Trying to get themselves out of a jam they tell the police to help themselves out. So the police need to give an explanation of why they're searching this truck. They take all the phones and they don't give them any information of, oh, no, we've

got you, we heard you on the phone. They let them go.

But what else do we have? In addition to the phone, the voice identification, we have Mr. Verdugo admitting to Agent Naylor when he was arrested in California that he delivered drugs. Now, first he denied it. That's human nature. But when Agent Naylor confronted him with the comment about Springfield, the Simpsons, the fact that they had his voice, that they had him on wiretap, that they knew about the delivery, then Mr. Verdugo admitted to that delivery. But he claimed he only did it that once. He didn't remember doing it again. And again, if you look at the transcripts, I won't go through them with you, you'll see from what Mr. Verdugo is saying it's clear he's been out here before. But he did admit that he had made that one delivery where he knew the police had him cold.

So in this case, ladies and gentlemen, I ask you to focus on the evidence, the jury instructions given by the judge, again, this case, conspiracy, an agreement to do a criminal act, that the Government must prove that these defendants agreed with others to do the criminal act and not these two defendants agreeing with each other, but agreeing with others named in the conspiracy and that you will find that the

proof is overwhelming that they conspired to possess the cocaine and to distribute it, proof beyond a reasonable doubt. And I ask you to return a verdict of guilty as to this count. Thank you.

THE COURT: Thank you, Ms. Rogers. It might make sense, let's take a ten minute break now, and we're going to make it short, ten minutes, quick break and then be back in with the two closing statements from the defendants, the rebuttal, and then the charge. Okay?

Charlie, show them out.

(Proceedings out of the presence of the jury as follows:)

THE COURT: Okay. I want to keep everybody close. Make sure the defendants are ready to get right back in.

(Short recess.)

(Proceedings in the presence of the jury as follows:)

THE COURT: Mr. Berg, would you like to go first?

MR. BERG: Thank you, your Honor. Good afternoon, ladies and gentlemen. You figure after 16 years of doing this you wouldn't get nervous, but I still do.

I want to talk a little bit about the evidence. There's been three or four days worth, and that evidence has given us a small glimpse of the life, basically, of my client, Mr. Fernandez-Roque. I might refer to him as just Roque or Rafael during this so I don't waste too much time with that long name.

Before I talk about what the evidence showed at the trial about my client, I'd like to first address something that's of critical importance to this case. It has to do with what you did not hear in this courtroom. What you did not hear in this courtroom is my client testify in his own defense. And I know it is human nature, including myself, to want to hear both sides of the story. When my kids get in a fight, before I decide who to yell at, I want to hear from each one of them. We all want both sides.

However, it's a bedrock principle in this nation, so important that it's contained in the Bill of Rights, that a person cannot be compelled to provide evidence against themselves and has a right to remain silent. It's a critical right. It's one the judge has told you about before. He's going to tell you about it again. And during jury selection, you took an oath that you would not hold the fact that my client didn't testify against him or even consider it in any manner,

and I'd implore you, please, stick to that oath, and I know you will.

So what did the evidence show us about Rafael Fernandez-Roque. I believe Agent Arnold, he's been here for about a month, he was training as a cook in a restaurant and was supposed to start a job at a Mexican restaurant in Newport the day that he was arrested.

And on that note, I know I told you there would be a witness to testify to that fact, but due to the circumstances that unfolded during the trial and the fact that Agent Naylor testified to most of what the witness would have testified, it wasn't necessary to bring him in.

But we do know Agent Naylor talked to the person, that he was going to be starting a job as a cook at a Mexican restaurant in Newport on May 30th at 10:00 a.m.

We also know or did not see, the evidence was, Mr. Fernandez-Roque being observed. There were agents conducting surveillance. They didn't see Mr. Fernandez-Roque. They didn't hear him on the wiretaps until, at the earliest, May 27th. So during that month, he really wasn't a player in the surveillance. He didn't pop on the scene until late, unlike some others, like Hipolito, who was known,

Chacho, Juan Carlos. The agents knew who those guys were. They were the main players in this case. Mr. Fernandez-Roque was not. We got a little candid glimpse into Mr. Fernandez-Roque. We know he has weird dreams about tornados. We overheard him in one of the wiretaps talking to Juan Carlos in an unguarded moment. Didn't sound -- just sounded like a casual conversation, nothing too intense. Just happened to pick it up.

And finally, probably what brings us here today, what we know about Mr. Fernandez-Roque is that on May 30th, 2007, in the early morning hours he was in a Jeep Cherokee with 29 kilograms of cocaine. I agree with the Government. That's beyond doubt. He was in that vehicle. We can't contest that. It's silly.

And I'll tell you what, that's a tough fact to overcome. It's tough for anybody who hears a case.

When Agent Naylor was confronted with my client in a Jeep with 29 kilograms of cocaine, he had no choice but to arrest my client. He would have been derelict in his duties to let him go. Twenty-nine kilos in a Jeep. Is it probable that my client is guilty? Perhaps you're thinking it's probable. Is it likely? Perhaps you're thinking it's likely he's guilty just by virtue of that fact.

However, that's not the world that this jury lives in. We don't live in the probabilities or the likelihood. This jury has to conduct its review in the world of beyond a reasonable doubt. That's the standard that's applied here. Again, it goes back to the Constitution of the United States. No conviction of guilt unless proof is given beyond a reasonable doubt.

Judge Smith is going to give you an instruction on what that means. It's a very in-depth instruction. He'll give you some guidance. I'm not going to belabor the point here. But that's where you work, in the world of beyond a reasonable doubt.

Agent Naylor, he works in the world of probable cause. The grand jury who gave this indictment, they just need to find that there's some reason to be here. They're in a different place. You, ladies and gentlemen, work in beyond a reasonable doubt.

Getting back to May 30th, my client, unfortunately, ran into Agent Naylor in western Massachusetts. I'll say this about Agent Naylor. He's what's right about law enforcement. He's a good cop. I'm probably going to have my membership in the association of criminal defense lawyers revoked for saying that, but it's true. He's hard-working. He was

up for practically 24 hours on the day in question. He's self-confident, and he's honest. He's not afraid to admit when he makes a mistake. He has his opinions based on his experience. He's willing to express his opinions based on his experience. But when he's confronted with evidence that he's wrong, he's willing to admit it and I respect that. He should be applauded for that. He's a credit to the Newport Police Department and the DEA. You don't see too much of that. I think Agent Arnold is an example of that. He got a little upset and frustrated when he thought perhaps he made a mistake. Instead of just admitting it, he got all worked up. I hate to say it, I got kind of drawn into the whole thing, too. But Agent Naylor, he's willing to admit he made a mistake, even with all his experience, his collective 14 years or so, he made some mistakes in this case. He admitted it.

One of the mistakes he made goes back to Exhibit 6, the Newport call we'll call it. That's what he was referring to it as. That call demonstrates something to this jury that I think is very important, that sometimes things aren't always as they appear.

Agent Naylor listens to this call, and in the context of what he was doing it was not unreasonable to think that this was one of these coded messages, these

phone calls between the main players. He'd been listening to them before and after. He knew something big was coming down the pike. He hears Newport, the three of us are going to make preparations. And he was confident enough to get on the stand, raise his right hand in another hearing and testify that this was a coded conversation about bringing three kilos down to Newport and making preparations to sell it.

But when he was confronted with the fact that maybe he was wrong, he was man enough to get up there and admit it. And it's a valuable lesson about sometimes things aren't always as they appear. You can't just jump -- he can jump to conclusions. He doesn't work in a world of beyond a reasonable doubt, but you can't.

You have the benefit of sitting here examining all the testimony, all the exhibits, and really scrutinizing things and seeing if there's some plausible explanation beyond the proof beyond a reasonable doubt.

As you examine the evidence in this case, there's some legal principles that are critical, and I refer to them throughout. Keep in mind one of these is called mere presence. The judge is going to charge you on it. I'm not going to belabor the point.

Basically, mere presence is a doctrine in the law that recognizes that sometimes the net of law enforcement is cast a little too wide, and sometimes people at the scene of a crime are not involved and shouldn't be found guilty. Maybe they even know criminal activity is going on. You can't convict someone just for being in the wrong place at the wrong time. You can't convict someone of being in the wrong place at the wrong time even if they know or might know there's something going on. The Government has to prove, to prove conspiracy, that Mr. Fernandez-Roque was a willing participant in this conspiracy, this agreement. If he was merely present, then you need to bring back a not guilty verdict.

Now, I'm going to take you through the evidence, examine it for you to look at when you get in there. These are just some of my thoughts. Doesn't mean you should exclude your own ideas and stick to what's said in this courtroom. The judge will tell you this isn't evidence. What the Government says and what I say isn't evidence, but here's what I believe the evidence shows and what my client believes it shows.

Obviously, there were numerous phone calls taking place leading up to May 30th. We have a binder with 23 of those phone calls in them, 5 of which are

made by my client. I know I made some issues about who owns the phone. That's my client's phone. The phone that was in his pocket on May 30th, those are him. I'm not going to sit here and dispute it. Five of the phone calls involve my client. Most of them involved telephone calls between Juan Carlos, who the Government is conceding is the ringleader in Providence, the boss. Most of the phone calls are between Juan Carlos and Chacho and the person with a California number I'm going to refer to as Mr. Verdugo, because that's what's on the transcript, but I don't want to step on toes here. I know Mr. Verdugo is not conceding that, but I'm going to refer to the person as Mr. Verdugo in my argument.

What do we know about these conversations? Well, at several points in these conversations between Juan Carlos, Chacho and Verdugo, there's references to calling each other Primo. In other words, I think Agent Naylor testified that Primo is a Spanish expression, literally cousin, but it's a term of endearment, a term of familiarity and these gentlemen, apparently, know each other. They refer to each other as Primo on several occasions in the exhibits.

You don't hear anyone referring to my client as Primo. Certainly, the familiarity just does not seem

to be here.

We also have these calls from or between Juan Carlos and Mr. Fernandez-Roque. We have Exhibit Number 6, the Newport call. But Agent Naylor also testified about a call that wasn't included in the package that happened on May 27th, a conversation between Mr. Fernandez-Roque and Juan Carlos having to do with directions and finding a place. So from that you can gather that, basically, Juan Carlos seems to be a source of transportation for Mr. Fernandez-Roque.

I know the Government is going to say that he worked for him, but he was taking him to -- he was relying on him to get him to work, and we know at least one other case he was relying on him to take him somewhere. They were discussing directions.

From these phone calls, you can also gather the conversations between Juan Carlos and Chacho that they weren't sure exactly what was going to happen. There's the discussion that's in Exhibit 3 about a guy, have him call me. Exhibit 4, don't get desperate; it's going to happen. These are all conversations between Chacho and Juan Carlos. They're not conversations between my client. He's not involved. He's not concerned. They're not getting phone calls from my client, Mr. Fernandez-Roque, wondering what's going on.

There's no evidence at this point my client had any knowledge of what's going on, any involvement. He's not like Chacho wondering what the deal is. He's not in the same boat as Chacho.

In fact, the only other phone calls that are in the binder -- well, the next two are basically phone calls from Juan Carlos on the evening of May 29th saying, I'm coming to pick you up. Agent Naylor said there's nothing coded there. He called him while he's driving there. Mr. Roque came downstairs -- Juan Carlos pulls up, tells my client he's there. He comes downstairs. He gets in the car and away they go. They pick up Chacho; they pick up the Jeep, and they get going and start heading to western Mass, which is, from what I gather, at least an hour-and-a-half to two-hour drive from here. You can apply your own experience in this courtroom, if you feel differently. I think Agent Barron said it was about 90 miles.

So there's no dispute that my client is in the car with Chacho. They're in the Jeep. Juan Carlos is in another car. Obviously, we can gather from the evidence, and I'll agree with the Government, that it's apparent that Chacho and my client are stooges.

Juan Carlos is insulating himself from this by putting Chacho and Mr. Fernandez-Roque in harm's way

while he kind of sits back. He's not going to take that risk. He's going to send his stooges out. He's exploiting them.

We don't know what the arrangement is, but certainly we can conclude that Juan Carlos is trying to do everything he can to insulate himself from detection if something goes wrong.

So the big question becomes why is my client, why is Mr. Fernandez-Roque in this car? What is the purpose? Is he involved in this agreement?

Now, the Government has come out with a theory that Juan Carlos needs -- can't just put one guy in there because he doesn't know how loyal this one guy may be. They need two guys in there because it's going to be less likely that the one guy is going to take off.

Ms. Rogers has provided that explanation of why two guys were necessary in that car.

Well, that might be so if Juan Carlos wasn't there. If Juan Carlos stayed in Providence and sent his henchmen to western Mass to pick up a load of drugs, then maybe that would hold water. But the fact of the matter is Juan Carlos didn't stay in Providence; he was right there. And if Chacho was going to double-cross him, Juan Carlos was right there, and he'd

be able to see it. That theory of needing two people to keep them loyal just doesn't seem to hold water.

I'm sure you're thinking of some theories of perhaps why my client was there that might indicate that he was involved. Maybe for security reasons.

Well, the testimony from everybody is there weren't any weapons involved here. No one found weapons. There were no weapons in the Jeep, no weapons in the hotel room, no weapons in the van. So that kind of puts into question whether security is the reason you'd need two people.

You can stand up, Mr. Fernandez-Roque. Stand up. This is not a big man right here. Okay? I doubt if Chacho -- if he was there to keep Chacho in line, this isn't the guy that you would pick for security reasons to secure the load of drugs.

Another plausible explanation that would indicate guilt would be maybe he was there to be a look-out. Chacho is doing the driving. Mr. Fernandez, maybe he's there to look out to make sure everything goes down without detection.

I would suggest that if you look at the evidence in this case, if Mr. Fernandez-Roque was a lookout, then he must be blind, because every officer that talked about -- we're dealing with western Mass at 3:00

in the morning. There's no traffic. Everybody said it, no cars on the road except 10 to 20 unmarked and marked police vehicles that are doing surveillance on the two target vehicles. It's like there's a swarm moving along the interstates of western Massachusetts. Kind of reminds me of, you know, my youngest son's youth soccer games where you have the ball and then you have all 20 players swarming around the ball and the rest of the area there's nobody.

Well, if Mr. Fernandez-Roque was a lookout, he's got to be the worst lookout that there ever was in the history of crime in America. It just doesn't make sense. And maybe you could see on the roads, but when they pulled into the rest area, which was deserted except for the one truck -- two trucks, I'm sorry, they pull in there and Agent Naylor or -- I'm sorry. Whoever pulled in. I forgot. It might have been Agent Naylor. The police vehicles and surveillance, they pull right into the rest area after them. They shut their lights off at one point, but they pulled in.

Now, I would think that if Mr. Fernandez-Roque was involved and serving as a lookout, he'd be looking behind them as they're about to come up to the critical moment and would have seen a vehicle pull in, not pull into the parking space the normal way, but pull in the

long way, cut his lights off. I would think that a person in his position that if they knew what was going on, if they were participating, they would be aware enough to look behind them and see.

Now, you have an aerial photo. I think it's Exhibit 43. And you can see that the lot kind of angles. And there is a clear sight line from where those trucks are to where Agent Naylor said that car was parked.

So if Mr. Fernandez-Roque was a lookout in this case, then he's the worst lookout that ever lived. I would suggest the more plausible explanation is that he didn't actually know what was going on, or maybe knew what was going on but didn't want any part of it. And in mere presence, just knowing what's going on is not enough.

Maybe at some point during this, maybe Juan Carlos said to Mr. Fernandez-Roque -- they're at least friends. I mean, he's talking about his dreams about tornados. The guy is his ride. There's also some evidence that maybe Mr. Fernandez-Roque worked for Juan Carlos at a garage.

So you have a guy who's a friend, a boss, an acquaintance talking to someone he knows. He's new in this country. Doesn't know a lot of people. Talking

to him and saying, Hey, I got to go do this. I'm going to give you a ride tomorrow. Do a favor for me. Come along. And maybe Mr. Fernandez-Roque knew that he was going to pick up something, a package while out on the road, but if you look at everything else, the why-would-he-be-theres, it just doesn't make sense that Mr. Fernandez-Roque knew what was going on.

I want to talk about another piece of evidence we heard about that I believe contributes to the conclusion that my client didn't know what was going on. I believe at least three officers testified about an open bag, duffle bag in the back seat of the Jeep; that when they came upon the scene, the bag was sitting there. It was unzipped. The bricks were just laying out there in plain view. They immediately saw it, immediately recognized what was going on, grabbed them, arrested the subjects.

You know, I heard this testimony, and my thought is why in the world would two trained professional drug couriers bring a bag with 29 kilos into their Jeep, not in the trunk of a car, in a Jeep where it can be seen and leave the bag open. And it's not like the exchange happened and the police swooped in and immediately arrested them. They were on that road driving after they left the rest stop for what Agent Naylor described

as an eternity. Plenty of opportunity to turn around, look there, zip the bag up. It doesn't make sense. What makes sense is that Mr. Fernandez-Roque knew a package was going to be delivered, didn't know what the nature of the package was, didn't think anything of it. The bag is put back there, and he's not going to turn around and look. There's nothing in his mind criminal going on. That's a more plausible explanation than that bag being opened.

If he knew he was picking up cocaine and that bag was placed in the back of the car, I would expect him to turn around and look at it. And if he turned around and he looked at it and he saw the bag was open, sometime during that drive, probably sooner than later, he would have turned around and zipped it back up. That's not the evidence in this case. It makes no sense that Mr. Fernandez-Roque knew what was in that bag, that he would have left it there sitting open in the back seat.

Now, again, I mean, the question is, I know it's a difficult question, is why was he there? Again, I believe the answer is that he was being, basically, used and exploited by Juan Carlos, one of the few people he had, he knew in Providence, the guy he relied upon. When he asked him to do a favor as a friend, as

a boss, he did it.

We know that Mr. Fernandez-Roque had contact with Juan Carlos, face-to-face contact, because there is that phone call where he says, You already said that. But we don't have phone calls, wiretaps of him having a discussion with him so we know that he's seen Mr. Juan Carlos and he's familiar with him, works for him, friends with him. And maybe he's doing him a favor. Like I mentioned before, maybe Juan Carlos asked him to go along to pick up a package in western Mass. My client's got to be at work the next day at ten o'clock in Newport. Sounds like he didn't quite know what he was getting into.

Maybe at some point he figured it out. But think about it. When did he figure it out? Did he figure it out when they were in Worcester? Did he figure it out when they were in Springfield? The guy's been here for 30 days. He's in the car in western Connecticut (sic), where there's not an exit for every 12 miles. Maybe he figured it out. Maybe he smelled the cocaine. Maybe he even saw it. But what is he supposed to do? Is he supposed to say, Hey, stop and let me out? He can't do that. He's stuck. He's almost a prisoner.

Maybe when he got to the Econo Lodge he didn't

want any part of it at that point. Get me out of here. Well, what's he going to do? He can't hitchhike. He's not going to take a bus or a cab. He's basically stuck there. He's not blind. He might have figured this out, but what could he do at that point?

Is that willfully joining a conspiracy? No. If he figures out something's going wrong and there's nothing he can do about it, that's not willfully joining a conspiracy and that's a not guilty verdict right there.

You got Chacho driving. You got Chacho talking on the phone while all this is going on. There's no evidence my client got out of that car and grabbed that bag. I think the evidence indicates otherwise, that someone in the truck got out and brought the bag to the Jeep. If you look at the recordings, the talk between Juan Carlos and Chacho and Juan Carlos and Verdugo, he's telling them to go between them, you know which guy it is. Sit there and wait.

Look at those recordings. I think the evidence is clear that someone from the truck got out and put it in the Jeep. It wasn't Mr. Fernandez-Roque grabbing that bag.

Another interesting nugget of information that came out about this is when the Jeep was pulled over,

Mr. Fernandez-Roque's phone was in his pocket. Agent Barron testified to that fact.

Now, if Mr. Fernandez-Roque was involved, you would expect that his phone would be out of his pocket as if he was expecting a phone call from Juan Carlos. They're still driving in tandem; they're still communicating. That's what one would expect.

In fact, in Mr. Verdugo's truck, the phones were all out. They weren't in a pocket. They weren't in a bag. They were right out there ready to use.

Again, these are little things you can take and analyze when looking at this case and conclude that there is reasonable doubt as to Mr. Fernandez-Roque's guilt.

Now, Exhibit 21 is the last phone call from Mr. Fernandez-Roque, and, obviously, the one that the Government is going to focus in on, point to it because that's the only phone call from my client since ten o'clock the night before, and it's after the exchange occurs. What does Mr. Fernandez-Roque say in that phone call? He says, "I'm ready." Okay? Agent Naylor testified he thinks it's code, meaning the deal is done even though Juan Carlos got on the phone with Verdugo and actually said, It's done.

Agent Naylor testified that, and I think he

honestly believes, that "I'm ready" means the deal is done. I would suggest that you can look at that, and I think it's a stretch, that translation, "I'm ready." Maybe if he said "Ready" or "It's ready." He said, "I'm ready." I mean, there's a thousand different ways you can interpret that, and I think a more plausible explanation is, Hey, you know what, it's four in the morning. I've got to be at work the next day. I'm in the middle of nowhere. "I'm ready." Get me out of here. I know what's going on. I figured it out at this point. He hears these conversations. Maybe he's not going to get on the phone and say in those words, Get me home, get me to work, I want out of here. He says, "I'm ready." He can't get out of that car and walk home.

Of course, we all know what happens next. They get stopped; the Jeep gets stopped. They find the drugs in there, and ten months later we find ourselves in this courtroom listening to the testimony, listening to the arguments.

And keep in mind, you need to find that Mr. Fernandez-Roque willfully joined this agreement, that he knew about it, and even if he knew about it, that he willfully joined in it, not that he was being used, not that he's being exploited, not that he found

himself in a difficult circumstance. You need to find that he knew what was going on at some point and made a decision, willful decision to join into that conspiracy. Not probably, not likely, but beyond a reasonable doubt, the highest standard known to law.

This is a difficult task. I mean, we have the easy job here. We come in here and do the job we do. We've been here before. You have the most difficult task. And I trust and Mr. Fernandez-Roque trusts that you'll do that job well, and when you're done, you'll find my client not guilty. Thank you.

THE COURT: Thank you, Mr. Berg. Mr. Voccola?

MR. VOCCOLA: Thank you, your Honor.

Good afternoon. I want to begin by thanking everyone here today. First of all, the Court staff; my co-counsel, Mr. Lusi; the marshals; sheriffs; his Honor, Judge Smith; and all of you for taking the time and the patience to listen carefully during the course of this trial, because I truly believe you have.

I don't think that you would have taken the oath and dedicated yourselves to this trial if you didn't truly believe in the process and the principles.

I know that Mr. Berg referred earlier to the fact that his client didn't take the stand. I think he did a very good job explaining the principles behind

it. I don't mean to be redundant, but I just want to touch on that again.

Now, my client didn't take the stand. And I know probably, if I put up my hand here today and I said, Hey, do all of you like to hear two sides of a story before you make a decision, I'm probably going to get a good show of hands here. That's common sense. I think everybody here would agree to that. That's not the way it works in the legal system, and there's a reason for that. It's because it's the Government's burden. They have the burden to prove this case by evidence and proof beyond a reasonable doubt. I don't have to do anything. I actually didn't have to ask a question. I didn't have to take a note. I didn't have to do anything at all.

It's actually the Government's burden. So they're the ones that have to prove to you that my client is guilty of this conspiracy. I respectfully submit, ladies and gentlemen, to all of you, in the fashion and the context in which this particular case was presented, it's impossible for the Government to meet that burden. And I don't make that suggestion lightly.

I'm not trying to pull the wool over anyone's eyes here. I encourage you, anything that I say,

please write it down and go back into the jury room and speak about it and talk about it. I respectfully suggest that.

What I am asking for is that you be fair and that you use your common sense. That's all that I'm asking. And I know that you will do that.

But I want to begin by talking about the Government's case. Now, let's say for some reason, and I will suggest in a few moments that you shouldn't adopt this position, but for some reason, all of you say I accept what the Government has offered here without question. I have no questions about any of the evidence, everything that they've offered to you I shouldn't question. Everything should be believed.

Well, I'm going to submit to you that even if you adopt that position they can't meet their burden, and I'll tell you why, and I'll suggest to you why.

What has the Government established? If you want to take that approach just for a couple of minutes here, ladies and gentlemen, if you want to take their approach in the purest form, what have they established? Well, they've established that Adolfo Verdugo's voice is on this wiretap and that only some type of meeting has been coordinated by him and that he participates in allowing perhaps an exchange to take

place. That's it. That's the case scenario right there. That's if you want to accept everything that they've offered to you.

Now, you should have some questions even if that's the position you want to adopt. Why? Because they still have to prove to you that Adolfo Verdugo intended to commit the underlying crime, possession -- the conspiracy to possess with intent to deliver the cocaine.

Why shouldn't you accept that with their best case scenario? Esteban Arias-Cortez. A few moments ago Ms. Rogers said the cookie jar with the imaginary friend. Guess what, ladies and gentlemen, he was real, Esteban Arias-Cortez. He's not an imaginary figure. He's real. We know he was there. They talked to him. They interviewed him. They put handcuffs on him. Why couldn't it have been that Esteban Arias-Cortez's idea to commit the underlying crime. Have they eliminated that doubt for you, that it could not have been Esteban Arias-Cortez's idea? No, they haven't.

As a matter of fact, Detective Naylor even said it was possible that Esteban Arias-Cortez could have picked up that bag of drugs. It was possible that Esteban Arias-Cortez could have touched those drugs. He testified to that.

So no matter what they suggest, meaning the Government, it cannot rule out this type of possible occurrence. Why not? What more should I even offer at this point? I'll tell you why. Adolfo Verdugo's legitimate. He's a legitimate man. We know that. Verdugo Trucking on the side of the truck. There was produce in the vehicle. He had an absolute legitimate reason to be in that -- to be where he was in that area.

Now, they're going to make a big deal about the fact that the truck was pointed in an opposite direction and this was peculiar. Well, if it was that peculiar at that particular time, don't you think Tom Nartowicz with 20 years of experience, 10 years especially working with narcotics would have questioned him about it? He didn't do anything about that. He didn't ask him one single question. So I don't submit to you that it was that peculiar, especially at three o'clock in the morning or 3:20 when you're trying to get rest.

Obviously, the produce was going to be delivered the next day, not at three o'clock in the morning. I'm sure whatever the name of the place was where he was supposed to deliver it, they're not open at 3:00 in morning. So what does it matter as long as it gets

there in the morning when the produce is supposed to arrive?

But Detective Naylor laid it out for us. He told us exactly what these big drug dealers -- how shrewd they are. He said they're shrewd, aren't they? Go back. You can talk about it. I don't think I'm making that up. He said something to the effect that these people are smart, that they don't tell everybody about their actions and the like.

So why couldn't have Esteban Arias-Cortez organized everything? Now, if Cortez -- they told you they found that ID from California on Cortez. So Cortez must be from California. I don't think it's a stretch to assume that, at least. He had identification to that effect. They were verifying ID's with immigration officials, Ryan Arnold and others who were checking the two of them out.

So if Cortez knows Verdugo, and he knows that Verdugo has a legitimate reason for going to Massachusetts and for a legitimate means, why can't he ask Verdugo for transportation?

Why couldn't he say to Verdugo: I need to get down there; I need to meet somebody, and I need to give something to someone. And if he's smart, wouldn't he not want to use his own phone and talk on the phone and

not drive it there himself if he's really a shrewd drug dealer? Can you rule out that possibility? Can you tell me that that didn't take place in the fashion in which this case was presented and the way that the Government presented it to you? No, you can't. It's entirely possible.

Now, Detective Naylor, Agent Naylor admitted to you when he was on the stand that there was no evidence at all, absolutely none, that Adolfo Verdugo looked, even looked at drugs. So we're going to have to assume that, but there was no evidence at all.

There's no evidence at all that Adolfo Verdugo picked up drugs. As a matter of fact, the evidence is to the opposite. We learned during the latter stages of this trial that Adolfo Verdugo had a cast on his arm. Remember Trooper Barron -- excuse me, Agent Barron, not Trooper Barron, even though his testimony was very short, it was very helpful. I asked him, you can go back and talk about it among yourselves with your notes, respectively, I asked him how did you pick up that bag. It was 65 to 70 pounds. He was making a big deal about it when he was on the stand about how heavy it was. He said, I probably had to use two hands. Well, thank you. I think that's accurate. I don't think he was non-truthful in his response to my

questions. But more than likely, it shows that Verdugo with one arm in a cast would have been physically incapable of making this quick exchange within a minute, which wasn't observed by anyone.

Did they rule that out to you? Are you convinced beyond a reasonable doubt that that could not have taken place? It's impossible in the context and the fashion in which the case has been presented to you. I know that the Government doesn't want you to accept that, but it's entirely plausible.

What about that photo? I want to talk about the photo that Detective Naylor claimed that he showed Mr. Verdugo with Juan Carlos on the side of the road.

Well, if you want to accept that he acknowledged knowing this individual, Juan Carlos Delgadillo, in some fashion, let's be really careful and not jump to any conclusions here. He never asked him how he got to know him, did he? Couldn't Cortez have introduced him to him? Did they rule that out, that Cortez could have introduced Delgadillo to Mr. Verdugo? Esteban Arias-Cortez? No, they didn't.

This is a very, very, very serious matter, ladies and gentlemen. In the beginning of the case, I suggested to you that it's been a nightmare for my client. It has been. I think all of you can see why.

It's going to come to an end. And only you, all of you can let it come to an end. I respectfully ask that you simply be fair in this matter. Hold the Government to its burden.

Now, I also expect that his Honor will instruct you that a defendant is never to be convicted on suspicion or conjecture. And if, for example, if you view the evidence in the case as reasonably permitting either of two conclusions; one, that a defendant is guilty as charged, or the other that a defendant is not guilty, you have to find the defendant not guilty.

I respectfully submit you're going to hear those instructions in a little while.

I would also submit that the wiretap isn't all-conclusive. If it were, the Government wouldn't be trying to offer you evidence of Mr. Verdugo's alleged confession or admission or any other information.

So there could have been calls made by Esteban Arias-Cortez that were drug-related that they didn't pick up on. That's entirely possible. It's not all-conclusive.

What were those two phones -- those three other phones there for? Could have been used in some fashion.

So what I'm suggesting to you, if you think

about it, and I don't think I'm trying to pull the wool over anyone's eyes, this is why I encourage you, I plead with you to please talk about what I say here today, that in order for the Government in this case to meet its burden, you're going to have pyramid inferences on unestablished facts. That's inappropriate. If a fact has been established for you, then you can start pyramiding. The judge will explain to you how that takes place, but what I'm saying to you is that the fact has to be established. In this particular case, best case scenario for the Government, they haven't established facts.

They have not established that there was a transfer, have they? Have they established that? No. They haven't. Why should you have a concern about that or a doubt about that? The K-9 dog. If the cocaine in that amount, 65 pounds was sitting in a truck traveling from California, it would have to emanate, have some type of odor associated with it. Don't forget, when Verdugo was pulled over or taken out at gunpoint by Nartowicz, that dog arrived shortly after. Now, they claim that they believe that the transfer took place say at around 3:20. The dog is on scene at around four o'clock in the morning. That's within a half hour. If the drugs were sitting in that bag for that long of a

period of time, something has to -- some odor should come out of there. I mean, it's only logical. Here's where common sense comes into play. And you don't have to be an Albert Einstein to figure this out. Use your common sense, all of you. Think about it. If the bag is sitting in there for that long of a period of time, there has to be -- and they've made it a point to stress to you that that bag has such an odor to it, it was overwhelming when the car was approached. Not only did Shankweiler attest to that, if I'm pronouncing his name correctly, but Barron told you that. Guess what? The dog, who has a better nose than a human being, came up with this immediately after. Nothing. Nothing at all.

So you should have a doubt as to whether or not a bag came out of that tractor-trailer. You should look into that. You should think about that. You shouldn't accept it without question. I respectfully don't, and I don't think that the Government has established that fact.

They've never even established the fact that drugs were in the truck at all, quite frankly. They've never established the fact that Mr. Verdugo knew that there were drugs in that truck. They never even established the fact that -- never established the fact

that Mr. Verdugo agreed to transport drugs.

And actually, I think that things become worse as the case goes on with respect to the presentation of the case. I don't mean any disrespect with that statement, but I would like to explain it to you. That's their best case scenario.

Let's talk about Ryan Arnold for a minute. Even he reported that he was told by Connelly and MacIsaac that two males delivered drugs. We never heard any testimony to that effect, but this man prepared a report and he wrote down information in there. Why am I bringing that up now? Why, Mr. Voccola, are you even reminding us of that testimony? Well, it shows there were assumptions made that were baseless. He said Connelly and Tully, one of those two, I can't remember who was riding with Detective Naylor the entire time, but he said both of them told him that.

So what I'm suggesting is a little statement like that from that immigration agent tells you a lot. They're assuming things. You can't do that. Not when -- you can't, not when you're making a decision on a case such as this. They have to prove it to you, and they haven't.

And what happens? I think what happened in this case is it's like when you're -- strike the word

"like." I apologize.

When you get a stain on your clothing and you try to remove that stain, sometimes it gets worse.

Now, the Government, obviously, wants you to believe that Mr. Cortez didn't do anything wrong. Right? He wasn't charged. They made a decision not to charge him.

What did Dan MacIsaac tell you? Dan MacIsaac told you that he told, he told Tom Nartowicz, Trooper Tom Nartowicz that Verdugo and Cortez, not just Verdugo, Verdugo and Cortez, check your notes if you don't remember that, talk about it among yourselves, that Verdugo and Cortez were going to be arrested at a later time.

What happens? Just Verdugo gets arrested, not Cortez.

They let Verdugo go because they don't want to jeopardize the investigation. Possibly he can lead them to some other drug activity. What happens? Nothing. They come up with nothing to show that this man is meeting with drug dealers, encouraging drug trafficking or anything of the like.

Actually, I think fortunately for Mr. Verdugo, it was a beneficial decision on his behalf because it corroborates his innocence. He didn't do anything

suspicious --

MR. BERG: I don't mean to interrupt, Judge, but we need to switch out.

THE COURT: Thank you. Go ahead, Mr. Voccola.

MR. VOCCOLA: As I said, I think it's very fortunate that Mr. Verdugo was released. Because when they did release him, nothing came about which could have suggested that he was involved in any type of drug activity. That's what they were expecting to find. And they didn't.

I told you that this case once before has been a nightmare for my client, and I respectfully submit that it has. But this nightmare can come to an end.

I'm just suggesting to you that when you deliberate to use your common sense, your collective common sense.

I also have respect for Agent Naylor. I'm not suggesting that he somehow made this diabolical plot to target Adolfo Verdugo and ruin his life. I'm not suggesting that at all. Agent Naylor is an asset to drug enforcement. Agent Naylor is intelligent, and Agent Naylor is smart. And I respect Agent Naylor. And I also submit to you that Agent Naylor knows, Agent Naylor knows that this case against Adolfo Verdugo has some problems with it. I submit to you that's why he

took the action he did in the manner in which he did. And we need to talk about that for a few moments, ladies and gentlemen.

There's no question that he should suspect Adolfo Verdugo. There's no question about that. It would have been -- he would have been completely derelict in his duties if he did not do so. There's no question that he should have conducted an investigation of Adolfo Verdugo. However, I don't believe Adolfo Verdugo should be convicted because there's not enough evidence to do that. He should have been not charged as Esteban Arias-Cortez is not charged.

Now, why do I say that? You're going to get a chance to look at the exhibits. The arrest warrant dated July 11th, 2007, at that time -- and you can actually look at the actual arrest warrant. It has a date on it, July 11th, 2007. That's the day that Agent Naylor asked a judge, a magistrate judge of this court to arrest --

MS. ROGERS: Objection.

THE COURT: Sustained.

MR. VOCCOLA: You can look at that arrest warrant and see what the charge is, conspiracy to possess with intent to distribute cocaine.

Fourteen days after its issuance, Detective

Naylor makes the arrest. He arrives on July 24th but makes the arrest on July 25th. He has never talked to Adolfo Verdugo at that time; however, he arrests him for this crime. So it's impossible for him to make any voice identification.

Now, as I told you a few moments ago, Detective Naylor is intelligent. He is. So now he knows, he has this man arrested. Think of it. Practicality-wise, common sense, not trying to pull the wool over anybody's eyes, he knows he has this man arrested for this charge of conspiracy to possess with intent to deliver cocaine. Well, obviously, what did he do? What evidence does he have at this point? The only evidence he has, supposedly -- what evidence does he have that differs from Cortez? The only evidence, supposedly, is that he said, That's my phone. They don't know that it's his voice. At that time, they don't know that it's his voice. Agent Naylor gets on that right away. All right. And they know that they need to identify the voice. How do they go about doing that? They have Agent Naylor tell you that he can without question tell you that it's Adolfo Verdugo on that telephone call. I don't accept that, and I don't think that you should. Are you convinced beyond a reasonable doubt that his voice is on that wiretap and

that Agent Naylor has proved that to you beyond a reasonable doubt? You shouldn't. I'll tell you why.

Agent Naylor talked to him for two hours, the most. Tommy Nartowicz, Tom Nartowicz, what did he tell you? He talked to him for four hours, twice as much time. That's the evidence that the Government submitted to you. Tom Nartowicz cannot identify Adolfo Verdugo's voice. Agent Naylor says he can identify Adolfo Verdugo's voice. What is more doubtful than that, ladies and gentlemen? How is that not doubt? That's suffocating doubt. You have to talk about that. That in and of itself creates doubt.

You have one trained narcotics detective who talked to the man for twice as much time, not able to identify his voice and another agent who talked to him for half as much time telling you that it is his voice. That has not been proven to you beyond a reasonable doubt.

But they want now, in the middle of the trial or toward the end of the trial, to correct this concern that they have. And let's face it, they knew it was a concern and they know it's a problem because when Ms. Rogers gave her opening statement she never told you that Tom Nartowicz was going to come into this courtroom to say that he could exclude voices.

MS. ROGERS: Objection.

THE COURT: Overruled.

MR. VOCCOLA: So toward the end of the trial, now we get Tom Nartowicz coming in. And I submit to you that it's ridiculous. It's absurd what he submits to you, that over a year ago, speaking to Esteban Arias-Cortez, over one -- almost a year ago, think of it, he can come in and listen to tapes two nights ago for the very first time and remember that's not him. That's not Esteban Arias-Cortez. You're supposed to accept that beyond a reasonable doubt? Absolutely not. Without equivocation, you should not accept that. That has not been proven to you beyond a reasonable doubt. You know why that's been done. They know that Agent Naylor is not enough to convince you that they heard Verdugo's voice. They want to correct that error. They want to bring Nartowicz in here, but it falls flat and it's ridiculous, because he says -- think about what he told us. It's a nasal and whining tone, because they want to make it the most distinctive voice of this person. Where does he slip up. Where does he slip up with that? He says he has a slight accent and he spoke to him in English. The calls are in Spanish. How do you remove yourself from the accent when you're listening to a Spanish phone call?

I'm not trying to fool anyone. I'm just suggesting to you that you have to look to this. This is so important, I submit to you, and that testimony by Tom Nartowicz actually, I think, helps the defendant, that they cannot meet that burden to prove to you that Adolfo Verdugo's voice is on that tape.

They might think it. Do I think Naylor believes it? Yes. Absolutely. I know Mike Naylor believes that. I submit to you that he does. I truly believe he does, but he can't prove it to you. It's impossible in the fashion in which they presented this case.

What about their own expert witness or their own witness who testified with respect to what she heard with regard to call number 23, Migalena Gonzalez.

I know she was only here for a short period of time, but let's talk about her for a minute. She's not certified by any court, state or federal. She's never testified in a court in her entire life. She took no classes in voice identification. But the reason why I'm bringing this up to you is that the Government has a duty to prosecute this case, and they do it vigorously. Let's face it. But they'll use any little edge they can to get their point across. I want you to play tape number 23. All of you can listen to it.

When Ms. Rogers was talking to you a few moments

ago, she likes to emphasize the fact that the word "It's done," is on there. It's done, the deal is done, alleging that it's Mr. Verdugo's voice, naturally. What did Migalena Gonzalez tell you? She said that the word "estuvo" means it's done. "Todo" means everything. You can listen to the tape. If you hear "estuvo" then accept that the word "it's done" should be on that transcript. That's the reason why we objected to it. I don't know if "estuvo" is ever stated or heard on that voice recording. I don't believe so. I believe there's even a question with respect to that. I'll leave it to your judgment. All the money that they have, all the resources are available to the federal government. They could have hired a voice expert, a voice exemplar, some type of individual who has machinery and training in voice identification to analyze voices. They could have. They didn't do it. They're relying on Naylor and Nartowicz.

I don't think that's enough. They certainly had the ability to do that. They chose not to. Maybe if they did, my client wouldn't have to be in this situation right now, ladies and gentlemen.

As I said before, I don't think it's difficult to figure out what happened in this case. That's why I

use the analogy of the sting. It gets worse.

Detective Naylor makes the arrest. He knows the only bit of evidence he has at the time of the arrest is Adolfo Verdugo allegedly admitting that the phone is his. He can't identify his voice. Now they come up with the voice identification but they know that that's not even good enough. All right. So now they add the confession. The confession. This is worse. This makes the stain worse, the confession. I think it's more bizarre, and I submit to you that what happens with respect to this alleged admission causes more concern and doubt than what took place with the voice identification. And I think we need to go over a few of those points right now.

Think of it. If he's this smart, organized drug dealer, he's going to make this type of confession? Does that make any sense at all? Unless you're completely -- there's something not functioning with your brain, why would you ever -- why would you ever, ever make an admission that you delivered 29 kilograms of cocaine two months after they released you. He denied it when he was in custody and he was handcuffed. Don't forget, Nartowicz told you, as well as MacIsaac, he denied any wrongdoing on the initial day. But two months later, after he hasn't seen or heard anything

from these agents and people, two months later on his home turf in California he's going to admit that he delivered 29 kilograms of cocaine.

I don't think so, and I think that you really have to think about that. And I don't think it's been proven to you beyond a reasonable doubt that he said that. Why? Because I think Detective Naylor tried to get him to admit it. I believe he wanted him to admit it, but he didn't admit it. Why? Because even Detective Naylor told you that he can't remember his exact words when he made this miraculous confession.

Now, I say Detective Naylor because I've known Agent Naylor for some time so I apologize if I'm going back and forth from detective to agent. But Agent Naylor admitted that when he takes a statement from somebody, he makes an effort to make sure that it's done knowingly, voluntarily and intelligently. That's what he said. You can go back to your notes, talk about it among yourselves. And in this particular case, he made that determination in 45 seconds.

Let's not forget the position he was in when he made that determination in 45 seconds. He held a rights card up with one hand. He said he was like this. He read him his rights. Within 45 seconds, that's it, this man knows everything, this man

understands the full ramifications of what he says to me. This man understands that what he says to me can be used in a court of law. He fully comprehends this, and he made this admission within a five- to ten-minute period delivering 29 kilograms of cocaine.

But guess what? In the middle of that 20-minute time period, after the first five or ten minutes, there's a Pomona police department officer named Machado who comes over and starts talking to Mr. Verdugo to see if Mr. Verdugo will allow him to search his residence.

Look at the other exhibit that's been admitted. It's a Spanish consent to search form. Spanish. Gutierrez, Detective Gutierrez, he remembers him being there. He came right over and he started talking. Detective Naylor said some English, some Spanish. Naturally, we talked about the form a little bit. The address is in English. I think there might be some other words in English on that Spanish form.

So common sense, ladies and gentlemen, common sense, Gutierrez and Machado had to utilize the Spanish form. Why would they utilize the Spanish form? To make sure that he can understand.

I'm not suggesting to you that Mr. Verdugo cannot speak any English at all. I'm not suggesting to

you that Mr. Verdugo doesn't understand some English. What I am suggesting to you is that with the benefit of some type of Spanish translation, Mr. Verdugo can comprehend fully what he would be attesting to or stating. I don't think that's a stretch. And I don't think it's a stretch for you to agree with me on that point. Why else would Machado and Gutierrez use this Spanish form? To assist them to create more time, more aggravation, more headache? No. They would have just done it in English. Machado came over first and spoke English. Mr. Gutierrez assisted next. Gutierrez is the one who spoke Spanish.

And if you look at that form, it was Machado who actually signed it along with Verdugo. Not Detective Gutierrez. What about all the other people that were there? Gutierrez, Machado, there were six or seven of them, I think, that I named. None of them heard it. None of them heard it. Not one of them heard the confession, heard this man bury himself and say, I delivered 29 kilograms of cocaine. Only Detective Naylor. Maybe he wanted to hear it. Maybe he pushed it a little bit. Maybe he knew he needed the confession because there were some problems with this case. Maybe he made a little rush to judgment on that assuming that he confessed. I think that's more

likely, ladies and gentlemen.

You have to look at this, again, and how it's done. This isn't as if they had him in a little tiny cell with two detectives working on him and pounding away at him for two hours and finally he cracks, I did it, I did it. That's not that type of confession. This type of confession supposedly takes place right at the side of the road. So it's even more bizarre under the set of circumstances. It's riddled with doubt. Replete. You should have a huge concern about this.

And Detective Naylor, we know, he's a skilled law enforcement agent. He had a recorder available. He admitted it. He had the recorder in the car. He didn't take it out.

Oh, big deal. Why didn't he take it out? He forgot. Well, he started to confess. You had the recorder. Gutierrez and Machado start talking to him. Now, they're letting him sign a form. He said the car was ten feet away. Go back to the car, get the recorder. You can bury him at this point and lock it up. It didn't happen. It didn't happen. It could have, but it didn't. They want you to accept this alleged verbal confession. How can you, ladies and gentlemen? You can't. That would be a travesty of justice. You have to look at the entire case, the

circumstances involved.

I appreciate your patience, and I appreciate your time, and I truly believe you will fulfill your function as jurors in this case and I think that you will try.

But I don't suggest to you what I'm saying is implausible, but you have to bear with me and just try to be fair. And if you are fair, I think you'll say in this case I understand, Agent Naylor, we appreciate the time and the effort that you put in this case. Let's face it. You removed 29 kilograms of cocaine off the streets. It is bad. Cocaine ruins lives. We all know people who get addicted to it. It's a horrible drug. And that was a valiant effort, and he should be commended. He was the man behind this case who removed this substance from the street.

But with all due respect to Detective Naylor, if you vote not guilty, it's not an insult to him. You're telling him, look, Detective Naylor, thank you for taking that substance off the street, but, with respect to Mr. Verdugo, we really don't believe you met your burden because you have not convinced us beyond a reasonable doubt in this particular case.

So I would simply suggest to all of you that when you take the time and the effort to analyze this

case, you should have some serious concerns.

And before I close, I'd just like to mention briefly, I probably should have mentioned this a few minutes ago, Detective Naylor's own report of the incident, even that is questionable. Don't forget, when I asked questions of Detective Naylor about his report, he said that he reported on the 27th that's when Verdugo admitted to delivering drugs. But there was a typographical error in the report and it was really the 30th. But then he said that -- and he actually said that Verdugo stated that on the 27th. We went back and forth about that. I said, Did you ever say May 27th or May 30th? No. Did you ever hear Mr. Verdugo say May 27th or May 30th? No.

Even with the report itself and the reporting of a confession, it was messed up. Even when he was testifying on the stand about Idelfonso Betancourt-Rodriguez's voice, he referred to his first name as Adolfo, because it got confusing. Think of how confusing it was during that five or ten-minute period when he's talking to him at that time, I think the report that he prepared reflected that. Don't forget what he told you initially, that Verdugo actually denied any so-called involvement with drug trafficking.

So he would have denied drug trafficking, but he

forgot to put that in the report. Remember, that's what he said, that he denied it but that wasn't put in the report.

So he would have -- if you really want to believe this, what he's telling us is that he denied it and then suddenly miraculously within this five-minute period or ten-minute period he suddenly confesses to it. It's just filled with doubt, ladies and gentlemen.

I know I'm probably forgetting more instances I should remind you of, but I know all of you if you go back in that room and use your collective knowledge will understand and discuss why there is doubt in this case.

So we're not insulting Detective Naylor. We're not committing a wrongdoing here. What we're doing is we're upholding the law because they have a burden to meet. And I think that all of you, once you discuss this case, will agree they haven't met it in this particular case.

So I ask you, respectfully, please return a verdict of not guilty with respect to Mr. Verdugo. Thank you.

THE COURT: Thank you, Mr. Voccola. All right. Ms. Rogers, you wanted some time to rebut. How much time do you want?

MS. ROGERS: Fifteen minutes, your Honor.

THE COURT: Ladies and gentlemen, I'm going to allow Ms. Rogers 15 minutes for rebuttal time. Then I think, as I've been thinking about this, it might be better to charge you in the morning because it's going to take me 20 to 30 minutes to give you a charge. Looking at the clock, I wouldn't have the charge completed until quarter after, twenty after five, and I don't think it's realistic you're going to do any productive deliberation in this case beginning at 5:15 or 5:30. Beyond that, I have to teach a class tonight at a law school and I need to generally leave here in time to get to that by six o'clock.

So I think for all of those reasons, it's going to be better to charge you in the morning. I'd rather have you start deliberating with my charge fresh in your mind. Okay?

So Ms. Rogers, I'll give you your 15 minutes. You don't have to use all of it.

MS. ROGERS: Thank you. I'll try not to.

I'm going to address my rebuttal points in the order that they were to the two defendants' attorneys.

Mr. Berg stated that his client -- the only evidence was with regard to May 29th and 30th with regard to his client. Keep in mind, this indictment

focuses on those two dates. We start on the 26th and we go to the 30th. Of course that's when his client's involvement is pertinent or relevant to this case, not the months before.

In call number five, he talks about Juan Carlos and Chacho and his client, Mr. Roque, Mr. Roque being the lousiest lookout in the world if that's what he was there for, but he also contradicts himself in that argument as well because he points out to you that he's just come to this country. He doesn't even know his address in Providence. Of course he doesn't know what the traffic conditions were like in Springfield. All of the police were concerned. They're all in unmarked vehicles. The troopers held back until they're called in to stop. But how could Mr. Roque possibly know that all those headlights behind him as he's been going, as he pulls off or Chacho pulls off are law enforcement. There's no way this man understands what's going on or what's normal for Springfield.

And the same thing holds true for Juan Carlos. If you look at call number five, when he is talking to Mr. Verdugo, he asks him, Will you stay over. I want to get a hotel. And Mr. Verdugo uses a profanity saying it's F'd up. I'm in this thing, I sleep in this thing, meaning the sleeper cab. It wouldn't make sense

to drive into the Econo Lodge with a sleeper cab. Truck drivers don't do it. They save their money by sleeping in the truck. But Juan Carlos says again at the end of the conversation, I don't know the area around there because I barely go around those places. As a matter of fact, I never go.

Juan Carlos has never been to Springfield either. They were supposed to go to Hartford. They went to Springfield, and for Juan Carlos or Mr. Roque to understand this is too much traffic for this area in Springfield, that doesn't raise any doubt.

For mere presence, Mr. Roque would like you to believe that he was simply there. Again, an unwitting dupe. Go back to call number 21, "I'm ready." And that call is very important to the Government's case. There's no evidence before you that that call means anything else but "I'm ready." And Agent Naylor admitted where he believed, given more facts, that his interpretation of the Newport call had changed, but he hadn't changed his opinion, "I'm ready." And again, if Mr. Roque had just stopped and unwittingly had 29 kilograms of cocaine put into a Jeep Cherokee with him, he doesn't call and say only to Juan Carlos, "I'm ready." He is going to say something a lot stronger than that and ask for an explanation.

And there is nothing. If truly Mr. Roque was there and didn't know what was going on, do you want to go home? "I'm ready" means get me out of here, I've got to go to work? He does not say that. I've got to go to work, you guys. Remember, you told me I've got to be in Newport at 10:00 a.m. He doesn't say that. Again, he's very vague. No more said than necessary. "I'm ready." The only reason he says it twice is because Juan Carlos apparently doesn't hear him. He goes, Huh? "I'm ready."

Now, the evidence again, as I stated that Mr. Roque knew about this part of the conspiracy, agreed to this conspiracy, if you look at in hindsight, those calls, he agreed, he obviously knew they were going to Springfield. He raises the fact that he needs to be at work. He says, Yes, I'm coming down, when he's picked up and he says, "I'm ready." All of this is evidence of his participation in this conspiracy, but the fact that he is there is evidence of his conspiracy.

One guy or two guys in the car, why does Juan Carlos want two? Just for the same reason that Juan Carlos is going to have an innocent party in that car. Chacho does not want an innocent party in that car. He doesn't want to take the risk of his friend, again,

blurting out and getting them in trouble. Large scale drug traffickers, common sense is they don't bring along somebody that doesn't know what's going on.

And Mr. Roque claim that or asked you to speculate Chacho is just a friend, I'm going along. What kind of friend takes you along on such a dangerous enterprise and exposes you to this kind of risk when you could be caught and doesn't tell you where you're going or why you're going? It does not make sense, and again, the Government's burden is beyond a reasonable doubt.

It does make sense that Chacho and Mr. Roque pull into the rest area and they pull out as quickly as they can. They want to get the heck out of Dodge. As the officers all told you, there's that strong odor of cocaine. So why doesn't he zip up the bag of cocaine, the 29 kilos? I submit the reasonable inference is they want to get out of there as fast as they can, but they want to make sure to check that bag, are there really 29 kilos. Because what would happen if they got only 28 and Juan Carlos is going to be looking at them and saying you hid one of the kilos and blaming them and somebody will be held accountable. That bag was still unzipped as they're traveling to check it out.

And you wouldn't expect Mr. Roque to call Juan

Carlos again after he's already notified Juan Carlos "I'm ready." Because where is Mr. Roque and Chacho? They're right behind Juan Carlos when the police pull them over.

With regard to Mr. Verdugo, Mr. Voccola would have you believe that the only evidence is that Mr. Verdugo coordinated a meeting. Mr. Voccola left out the fact that the defendant admitted that he did this drug deal, that he admitted it was his telephone.

The evidence here with regard to Mr. Verdugo's voice is we know it's not Arias-Cortez's voice. And the evidence with regard to Mr. Verdugo is he's talking on that phone setting up this deal. The conversations prove that he conducted these conversations; he conspired to do this agreement. The evidence doesn't show that Arias-Cortez conducted these conversations with Juan Carlos.

The burden of the Government is beyond a reasonable doubt. So did Arias-Cortez probably pick up that bag and carry it to the truck because Mr. Verdugo couldn't? Probably. But that's not evidence of the charge before you of beyond a reasonable doubt, the conspiracy. There's no evidence that the Government has to show you that Mr. Arias-Cortez conspired. So Mr. Arias-Cortez is not charged in the conspiracy

because the Government realizes it's burden is beyond a reasonable doubt but there's overwhelming evidence of Mr. Verdugo and that's why he's in the courtroom before you today. There's no evidence that it's Mr. Arias-Cortez that was on these phones. It's simply speculation.

Mr. Verdugo also, or his attorney, argued both sides that the dog should have alerted to the cab. Who, if they're doing a drug deal, carries across from California the cocaine inside his cab. Just as the agent told you the Jeep reeked of cocaine. Undoubtedly, it was in the back with the produce. That's a legitimate delivery but it's the cover of delivery. And that doesn't erase the evidence that there was a drug delivery had occurred. It's just a clever way of doing it to reduce risk.

So Mr. Voccola would like you to believe that Mr. Verdugo didn't know anything about this, Arias-Cortez even though his voice isn't on any of the phone calls, he doesn't have the 909 phone numbers, he doesn't have a Cingular phone or signed for it, and Mr. Verdugo does, and that's when these conversations occurred, but there should have been so much of an overwhelming odor of cocaine that Mr. Verdugo didn't ask what is this hockey bag doing in the cab with us.

It reeks. What are you doing, Mr. Arias-Cortez? It's not plausible. It's pure speculation. And I ask you to focus on the evidence before you.

Again, the Government asks you to look at voice identification and the admissions made by Mr. Verdugo.

Agent Naylor testified before you for over two days. Agent Naylor is a respectful officer. He is a personable individual. He testified he likes to establish a rapport with defendants, and he treats them with the same respect and courtesy. And it's not surprising that he established a dialogue with Mr. Verdugo and Mr. Verdugo talked to him. He knew -- originally he said, no, he didn't do it, but then he knew Agent Naylor had overwhelming evidence against him.

So in summary, again, the Government is aware of its burden. It's a burden that every day in every court across the country, the evidence here is clear beyond a reasonable doubt that both of these defendants are guilty of conspiracy. I ask you again to return a verdict of guilty. Thank you.

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

_______________________________________

Anne M. Clayton, RPR

June 17, 2008

_________________________________________

Date